# No. 14-_____

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◄◄

VIMEO, LLC D/B/A VIMEO.COM, CONNECTED VENTURES, LLC,

*Petitioners,*

v.

CAPITOL RECORDS, LLC, CAROLINE RECORDS, INC., VIRGIN RECORDS AMERICA, INC.,

*Respondents.*

_____

*Interlocutory Appeal Sought From The U.S. District Court
For The Southern District of New York
Hon. Ronnie Abrams, District Judge*

## PETITION FOR PERMISSION TO APPEAL
## PURSUANT TO 28 U.S.C. § 1292(b) AND FED. R. APP. P. 5

Michael A. Cheah
VIMEO, LLC
555 West 18th St.
New York, NY 10011
(212) 314-7457

Kathleen M. Sullivan
Robert L. Raskopf
Sanford I. Weisburst
Todd Anten
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Ave., 22nd Flr.
New York, NY 10010
(212) 849-7000

January 10, 2014

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, undersigned counsel states as follows:

1.     Petitioner Vimeo, LLC is a subsidiary of IAC/InterActiveCorp ("IAC"), a publicly held corporation, and no publicly held corporation other than IAC owns 10% or more of its stock.

2.     Petitioner Connected Ventures, LLC is a subsidiary of IAC, and no publicly held corporation other than IAC owns 10% or more of its stock.

3.     IAC has no parent company and no publicly held corporation owns 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ........................................................i

PRELIMINARY STATEMENT ....................................................................1

QUESTIONS PRESENTED....................................................................3

RELIEF SOUGHT ....................................................................4

FACTUAL BACKGROUND ....................................................................4

ARGUMENT ....................................................................9

I.    Whether The DMCA's Safe-Harbor Provisions Apply To Sound
      Recordings Fixed Prior To February 15, 1972 Warrants Interlocutory
      Review ....................................................................10

      A.    The Issue Is A Controlling Question Of Law ....................................10

      B.    There Is Substantial Ground For Disagreement On This Issue ..........12

      C.    An Immediate Appeal May Materially Advance The
            Termination Of The Litigation ............................................13

II.   Whether "Red Flag" Knowledge May Arise From Viewing A Video
      Containing An Entire "Recognizable" Song Warrants Interlocutory
      Review ....................................................................14

      A.    The Issue Involves A Controlling Question Of Law ........................14

      B.    There Is Substantial Ground For Disagreement On This Issue ..........16

      C.    An Immediate Appeal May Materially Advance The
            Termination Of The Litigation ............................................20

CONCLUSION ....................................................................20

CERTIFICATE OF SERVICE ....................................................................22

ii

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Am. Geophysical Union v. Texaco Inc.*,
  802 F. Supp. 1 (S.D.N.Y. 1992) ............................................................12, 14, 20

*Arista Records, Inc. v. MP3Board, Inc.*,
  No. 00-cv-4660, 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ......................12

*Arista Records LLC v. Lime Group LLC*,
  No. 06-cv-5936, 2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011)........................11

*Atlantic Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009) .................................................................12

*Atlantic Recording Corp. v. XM Satellite Radio, Inc.*,
  No. 06-cv-3733, 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007)...........................12

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) .................................................................................17

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011) .......................................................7, 11, 17

*Capitol Records, LLC v. ReDigi Inc.*,
  934 F. Supp. 2d 640 (S.D.N.Y. 2013) .................................................................11

*Capitol Records, LLC v. VideoEgg, Inc.*,
  611 F. Supp. 2d 349 (S.D.N.Y. 2009) .................................................................12

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) .................................................................................17

*Consub Del. LLC v. Schahin Engenharia Limitada*,
  476 F. Supp. 2d 305 (S.D.N.Y. 2007) .................................................................10

*In re Duplan Corp.*,
  591 F.2d 139 (2d Cir. 1978) ................................................................10, 11, 14, 16

*In re Fosamax Prods. Liab. Litig.*,
  No. 06-md-1789, 2011 WL 2566074 (S.D.N.Y. Jun. 29, 2011) ......................12

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri - Gestione Motonave Achille Lauro In
  Amministrazione Straordinaria*,
  921 F.2d 21 (2d Cir. 1990) ..................................................................10, 11, 16

*Koehler v. Bank of Bermuda Ltd.*,
  101 F.3d 863 (2d Cir. 1996) .................................................................................14

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ........................................................17

*Pollock & Riley, Inc. v. Pearl Brewing Co.*,
    498 F.2d 1240 (5th Cir. 1974) ......................................................12

*S.E.C. v. Credit Bancorp, Ltd.*,
    103 F. Supp. 2d 223 (S.D.N.Y. 2000) ......................................11, 16

*UMG Recordings, Inc. v. Escape Media Group, Inc.*,
    948 N.Y.S.2d 881 (N.Y. Sup. Ct. 2012) ......................................13

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ..................................................*passim*
    718 F. Supp. 2d 514 (S.D.N.Y. 2010) ........................................17, 19

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02-cv-3288, 2003 WL 22953644 (S.D.N.Y. Dec. 16, 2003).....................14

## Statutes

17 U.S.C. § 301(c) ........................................................6, 10, 11

17 U.S.C. § 512 ........................................................1, 8, 15

17 U.S.C. § 512(c) ........................................................19

17 U.S.C. § 512(c)(1) ........................................................2, 6

17 U.S.C. § 512(c)(1)(A)(ii) ........................................................5, 18

17 U.S.C. § 512(d) ........................................................19

17 U.S.C. § 512(m) ........................................................17

28 U.S.C. § 1292(b) ........................................................1, 3, 7, 9

## Additional Materials

Senate Report No. 105-190 (1998) ........................................................4, 18, 19

Appellants' First Brief on Cross-Appeal,
    *Lenz v. Universal Music Corp.*, No. 13-16106(L),
    Dkt. 23 (9th Cir. Oct. 9, 2013)........................................................19

## PRELIMINARY STATEMENT

Pursuant to 28 U.S.C. § 1292(b) and FRAP 5(a), Petitioners Vimeo, LLC and Connected Ventures, LLC (collectively, "Vimeo") respectfully petition for permission to appeal an order of the U.S. District Court for the Southern District of New York (Abrams, J.), dated September 18, 2013 (as amended on December 31, 2013, the "September 18 Order") (Ex. A).  In an order dated December 31, 2013 (the "December 31 Order") (Ex. B), the district court certified two issues decided in the September 18 Order as satisfying § 1292(b)'s criteria.

This Court should grant the petition for interlocutory review.  The certified issues present important and purely legal questions regarding the scope of the online safe-harbor provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 512, *et seq.* ("DMCA").  They also present this Court with a significant opportunity to clarify the implications of its decision interpreting those provisions in *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012).  The issues proposed for appeal have great significance for the future of user-generated content on the Internet.

This case specifically concerns music in videos uploaded to websites that host user-generated content.  Vimeo operates such a website.  Respondents, the owners of various musical compositions and sound recordings, allege that Vimeo

1

infringed their copyrights because certain users uploaded videos incorporating Respondents' music.

The DMCA affords service providers like Vimeo a safe harbor from claims of copyright infringement if they satisfy the criteria set forth in 17 U.S.C. § 512(c)(1).  The district court granted partial summary judgment to Vimeo on safe-harbor grounds for 153 out of the 199 videos as to which the initial complaints alleged copyright infringement.  But the court denied Vimeo summary judgment as to two particular categories of videos, ruling that: (1) the DMCA's safe-harbor provisions do not apply to claims of common-law copyright infringement based upon sound recordings fixed prior to February 15, 1972; and (2) summary judgment is unavailable where the service provider's staff viewed user-generated videos that incorporate "copyrighted songs played essentially in their entirety and in unedited form" because use of the music in such a manner might be a "red flag" giving rise to knowledge of infringement.  Ex. B. at 21.  The court also granted leave to amend the complaints to include additional videos, many of which will fall in these two categories.  These rulings, if not reviewed and reversed on interlocutory appeal, will necessitate trial proceedings on potentially hundreds of videos.

On December 31, 2013, the district court certified the September 18 Order for interlocutory appeal.  *See* Ex. B at 18-20 (discussing question of safe-harbor

protection for pre-1972 sound recordings); *id.* at 20-23 (discussing question of "red flag" knowledge from employee viewing).  The district court's certification order properly analyzed the criteria for interlocutory appeal set forth in § 1292(b), recognizing the split or dearth of authority on two legal issues, the substantial practical implications of its ruling for Internet service providers, and the fact that this Court's decision "has the potential to narrow the litigation significantly."  *Id.* at 19-20 n.10.

This Court should now grant the petition and provide interlocutory review. This Court's decision on these issues will provide much-needed guidance to the lower courts in the wake of *Viacom v. YouTube*, dispel uncertainty among website operators that host or store user-generated content concerning the scope of their DMCA safe-harbor protection, and, in the event of reversal, avert wasteful trial proceedings over potentially hundreds of videos as to which DMCA safe-harbor protection should be afforded as a matter of law.

## **QUESTIONS PRESENTED**

1.     Whether the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior to February 15, 1972.

2.     Whether, under *Viacom Int'l, Inc. v. YouTube, Inc.*, a service provider's viewing of a user-generated video containing all or virtually all of a

recognizable, copyrighted song may establish "facts or circumstances" giving rise to "red flag" knowledge of infringement.

## RELIEF SOUGHT

Petitioners request permission to take an immediate appeal from the September 18 Order.  If permission is granted, Petitioners will argue that this Court should reverse the district court's rulings on the two questions set forth above.

## FACTUAL BACKGROUND

The DMCA provides a safe-harbor defense that "allow[s] qualifying service providers to limit their liability for claims of copyright infringement."  *Viacom*, 676 F.3d at 27.  Congress enacted the DMCA safe-harbor provisions in recognition that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability" and that "limiting the liability of service providers" for hosting user-generated content "ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  Senate Report No. 105-190 at 8 (1998) ("S. Rep.").

Vimeo operates an online video-hosting and video-sharing website, http://www.vimeo.com.  Vimeo focuses on the sharing of original, non-commercial videos that the user personally created, ranging from home movies to school projects to more artistic endeavors.  As of September 2012, Vimeo had a database

4

of over 31 million videos, with about 12.3 million registered users uploading about 43,000 new videos every day.  Vimeo's Terms of Service require that users upload only videos for which they have all necessary rights (including copyrights).

Respondents sued Vimeo, alleging that certain videos located at specified URLs on Vimeo's website infringed their copyrights in certain sound recordings and musical compositions.[1]  The parties conducted discovery on the limited issue of Vimeo's DMCA safe-harbor defense. The parties filed cross-motions for summary judgment addressing, *inter alia*: (1) whether Vimeo satisfied the DMCA's threshold eligibility criteria; and (2) if so, whether Vimeo was entitled to safe harbor for the specific videos at issue.

The district court determined that Vimeo satisfied the threshold criteria for DMCA safe-harbor eligibility as a matter of law.  *See* Ex. A at 12-23.  The district court then addressed the additional safe-harbor criteria on a video-by-video basis, inquiring whether Vimeo had actual knowledge of infringement or was "aware of facts or circumstances from which infringing activity [was] apparent," 17 U.S.C. § 512(c)(1)(A)(ii), the latter often referred to as "red flag" knowledge.  *See* Ex. A at 28-33.

---

[1]    Respondents filed two actions:  *Capitol Records, LLC v. Vimeo, LLC*, 09-cv-10101, involves record labels (the sound recording owners), while *EMI Blackwood Music, Inc. v. Vimeo, LLC*, 09-cv-10105, involves publishing companies (the musical composition owners).  The cases were consolidated for purposes of summary judgment.

The district court initially granted Vimeo summary judgment on 136 of the original 199 videos-in-suit because there was no evidence that Vimeo knew about them, much less watched them. *See* Ex. B at 3. The court denied Vimeo summary judgment, however, as to videos that Vimeo employees had apparently watched, finding that, although there was no evidence of "actual knowledge" of copyright infringement, a triable issue of fact existed concerning whether Vimeo had "red flag" knowledge of infringement. Ex. A at 32-33. While the court acknowledged that other courts "have observed[] that a service provider may not be able to determine whether a particular work is infringing solely by the act of viewing it" (*id.* at 32), it nonetheless held that Vimeo's mere awareness of the presence of a "well-known" song "unmodified and in [its] entirety" in a video might support a jury's conclusion that infringement would have been "'objectively' obvious to a reasonable person" (Ex. B at 11 (quoting *Viacom*, 676 F.3d at 31)).[2]

Separately, the district court ruled that the DMCA's safe harbors do not apply to videos containing sound recordings fixed prior to February 15, 1972, based on a pre-DMCA provision of the Copyright Act, 17 U.S.C. § 301(c), which provides that, "[w]ith respect to sound recordings fixed before February 15, 1972,

---

[2]   The district court also held that, as to ten videos uploaded by individuals who at the time were (or later became) Vimeo employees, there was a triable issue whether such videos were stored "at the direction of a user" within the meaning of 17 U.S.C. § 512(c)(1). Ex. A at 24-26.

any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067." Ex. A at 54-55. In so holding, the court expressly disagreed with another recent decision in the Southern District of New York. *Id.* at 55 n.21 & Ex. B at 19 (citing *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 640-42 (S.D.N.Y. 2011) (Pauley, J.)).

Vimeo moved to reconsider parts of the September 18 Order and to certify the two issues presented herein for interlocutory appeal. Respondents did not oppose the request for certification.[3] The district court granted reconsideration in part, awarding Vimeo summary judgment on an additional 17 videos, and also granted Respondents' motion for leave to amend their complaints to add hundreds of additional videos to the litigation. In its December 31 Order, the district court concluded that both issues merited interlocutory review by this Court under 28 U.S.C. § 1292(b). *See* Ex. B at 16-23.

*First*, the district court determined that the applicability of the DMCA to pre-1972 sound recordings "turns almost exclusively on a question of statutory interpretation." *Id.* at 19. It further "recognize[d] that there exists a substantial ground for difference of opinion on this issue," as another court in the same district

---

[3] Respondents purported to condition their non-opposition on the district court's also certifying *seven* additional questions for interlocutory appeal. *See* Ex. B at 17. The district court determined that none of "[Respondents'] proposed questions satisfy the statutory criteria." *Id.* at 23.

"reached the opposite conclusion," and the issue "is a question of first impression in the Second Circuit." *Id.* at 19-20. Finally, the court found that an immediate appeal would materially advance the ultimate termination of the litigation, as "a large swath" of the videos-in-suit containing pre-1972 sound recordings would be dismissed if the DMCA applied to them. *Id.* at 20.

*Second*, the district court determined that a controlling issue of law is presented by its ruling that the presence of an entire, well-known song in a user-generated video may give rise to an inference of "red flag" knowledge, noting that "[d]etermining whether [Vimeo] had 'red flag' knowledge turns largely on the construction of 17 U.S.C. § 512 and the Circuit's opinion in *Viacom*." *Id.* at 21. Further, the court found that substantial ground for difference of opinion exists because the issue is a "difficult" one that has "important ramifications for service providers," and that, while "*Viacom* defined 'red flag knowledge,'" it "did not address whether content can be obviously infringing on its face or how that concept interacts with various possible defenses to infringement, such as 'fair use.'" *Id.* at 21-22. Finally, the court found that an appeal would advance the ultimate termination of the litigation because "[r]eversal of the Court's decision on the issue … could lead to a grant of summary judgment in favor of [Vimeo] on most, if not all" of the videos in question. *Id.* at 22.

Ultimately, the district court concluded that, if this Court agrees with Vimeo on both certified questions, "the litigation may well be narrowed … to 29 instances" of alleged infringement. *Id.* at 22-23. This timely Petition followed.

## ARGUMENT

This Court should grant the Petition for interlocutory review. The district court properly determined that each of two issues decided in the September 18 Order—the pre-1972 sound recordings issue and the "red flag" issue—present "a controlling question of law as to which there is substantial ground for difference of opinion" and as to which "immediate appeal ... may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). In addition, both issues have "important ramifications" (Ex. B at 21) for service providers far beyond Vimeo.[4] Under the district court's ruling, service providers may well remove original user-generated content that does not in fact infringe, resulting in both costs to the service provider and the needless diminution of lawful content. This Court's guidance is needed to dispel confusion on these questions both for service providers and the lower courts. Additionally, immediate appellate review will serve judicial economy because a reversal would avoid the need for trial of potentially hundreds of discrete claims of infringement.

---

[4] Neither question is at issue in the appeal currently pending before this Court in *Viacom Int'l, Inc. v. YouTube*, *Inc.,* No. 13-1720.

I.    **WHETHER THE DMCA'S SAFE-HARBOR PROVISIONS APPLY TO SOUND RECORDINGS FIXED PRIOR TO FEBRUARY 15, 1972 WARRANTS INTERLOCUTORY REVIEW**

A.    **The Issue Is A Controlling Question Of Law**

A question of law is "controlling" in a wide range of circumstances, including where its resolution "may importantly affect the conduct of an action." *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (Friendly, J.). Resolution "need not necessarily terminate an action in order to be 'controlling.'" *Klinghoffer v. S.N.C. Achille Lauro Ed Altri – Gestione Motonave Achille Lauro In Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990). Additionally, this Court considers "the impact that an appeal will have on other cases." *Id.* Here, the district court correctly determined that whether the DMCA's safe-harbor provisions apply to sound recordings fixed prior to February 15, 1972 is a controlling question of pure law, thus satisfying this statutory criterion.

*First*, the district court correctly determined that this issue "turns almost exclusively on a question of statutory interpretation." Ex. B at 19. As a result, "'the reviewing court could decide [it] quickly and cleanly without having to study the record.'" *Id.* (quoting *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007)). The primary question is whether Section 301(c) of the Copyright Act, which provides that the Act does not curtail common-law or state-law rights in pre-1972 sound recordings before 2067, can be read to

10

narrow the scope of the subsequently enacted DMCA.  The district court held that it could, while Judge Pauley, in *MP3tunes*, reasoned to the contrary that, "[r]ead in context, section 301(c) is an anti-preemption provision ensuring that the grant of federal copyright protection did not interfere with common law or state rights established prior to 1972.  But section 301(c) does not prohibit all subsequent regulation of pre-1972 recordings."  *MP3tunes*, 821 F. Supp. 2d at 641.

*Second*, the Court's resolution of the issue would "importantly affect the conduct" of the litigation.  *In re Duplan*, 591 F.2d at 148 n.11.  The complaints in these two consolidated actions, as amended, allege infringement as to 352 videos incorporating pre-1972 sound recordings.  *See* Ex. B at 19.  For most of these videos, DMCA safe-harbor eligibility will turn almost "exclusively" on resolution of this issue; if safe harbor were available, "a large swath" of these infringement claims "would be dismissed."  *Id.* at 19-20.

*Third*, resolution of this issue would have important precedential value.  *See Klinghoffer*, 921 F.2d at 24; *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000). Respondents and other music rights-holders have filed multiple lawsuits in this Circuit alleging that service providers and other online entities have infringed their copyrights in pre-1972 sound recordings.[5]  To date, no

---

[5]   *See*, *e.g.*, *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 657 n.8 (S.D.N.Y. 2013);*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 640-42 (S.D.N.Y. 2011); *Arista Records LLC v. Lime Group LLC*, No. 06-cv-5936,

federal appellate court has addressed this issue of DMCA safe-harbor applicability. A ruling from this Court would provide much-needed guidance to copyright holders and service providers alike. *See Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 30 (S.D.N.Y. 1992) (Leval, J.) ("The shared interests of large research corporations and the publishing community would be importantly served by an immediate appeal, clarifying these [copyright] questions.").

### B.    There Is Substantial Ground For Disagreement On This Issue

"There is substantial ground for difference of opinion when the authority on a point of law is in conflict, or when there is a relative lack of authority on the precise question." *In re Fosamax Prods. Liab. Litig.*, No. 06-md-1789, 2011 WL 2566074, at *5 (S.D.N.Y. Jun. 29, 2011) (quotation marks and citation omitted). As noted above, both circumstances exist here:  (1) the September 18 Order created a direct intra-district conflict on this precise issue; and (2) this Court has yet to provide guidance on this question.  *See Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 F.2d 1240, 1242 n.2 (5th Cir. 1974) (conflict is more "significant

---

2011 WL 1641978, at *1 n.2 (S.D.N.Y. Apr. 29, 2011); *Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 (S.D.N.Y. 2009); *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 368 (S.D.N.Y. 2009); *Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, No. 06-cv-3733, 2007 WL 136186, at *1 (S.D.N.Y. Jan. 19, 2007); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00-cv-4660, 2002 WL 1997918, at *12 (S.D.N.Y. Aug. 29, 2002).

and demanding of a resolution" where the decisions "are from district courts in the same district").[6]

### C.   An Immediate Appeal May Materially Advance The Termination Of The Litigation

An immediate appeal of the pre-1972 sound recordings issue may materially advance the termination of the litigation.  Respondents' complaints, as amended, identify 352 videos allegedly containing pre-1972 sound recordings.  *See* Ex. B at 19.  Because "a large swath" of those videos would otherwise be eligible for safe-harbor protection, a ruling by this Court that the DMCA applies to pre-1972 sound recordings would result in dismissal of most of these infringement claims.  *Id.*

Further, if the DMCA's safe-harbor provisions were held to apply to pre-1972 sound recordings, an enormous amount of discovery and trial time would be avoided with respect to these 352 separate claims of copyright infringement.  As then-District Judge Leval noted in certifying an order involving multiple claims of copyright infringement:

> If Texaco is not permitted to take an appeal from this court's ruling, the parties and the court will be obliged to face voluminous unnecessary litigation of the claims of 84 plaintiffs, including innumerable technical defenses. … Discovery and trial of these issues would consume vast amounts of expense and time for the parties. Trial could occupy the court for many months.

---

[6]   In addition, one New York state trial court and one New York state appellate court have each addressed the issue, coming to opposite conclusions.  *See UMG Recordings, Inc. v. Escape Media Group, Inc.*, 948 N.Y.S.2d 881 (N.Y. Sup. Ct. 2012), *rev'd*, 964 N.Y.S.2d 106 (N.Y. 1st Dep't 2013).

*Am. Geophysical Union*, 802 F. Supp. at 29. So too here, the swift removal of a "large swath" of videos—obviating discovery and trials on each of these claims—would "substantially accelerat[e] the disposition of the litigation." *In re Duplan*, 591 F.2d at 148 n.11; *see also In re WorldCom, Inc. Sec. Litig.*, No. 02-cv-3288, 2003 WL 22953644, at *4 (S.D.N.Y. Dec. 16, 2003) (§ 1292(b) "is 'aimed to vindicate the final [goal] of saving trial court time by avoiding fruitless litigation'") (quoting *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865-66 (2d Cir. 1996)).

## II.   WHETHER "RED FLAG" KNOWLEDGE MAY ARISE FROM VIEWING A VIDEO CONTAINING AN ENTIRE "RECOGNIZABLE" SONG WARRANTS INTERLOCUTORY REVIEW

### A.    The Issue Involves A Controlling Question Of Law

Whether a service provider's viewing of a user-generated video that contains an entire "recognizable" song automatically raises a triable issue of fact as to the service provider's "red flag" knowledge of infringement presents a controlling question of law. Ex. B at 21-22. No other court has ever ruled that a service provider's mere awareness that a song appears in its entirety in a user-generated video always precludes summary judgment in favor of the service provider—notwithstanding that the integration of that music into an *original* video effectively repurposes the music. This ruling conflicts with the DMCA as interpreted by

14

*Viacom* and will force service providers to make exactly the sort of difficult legal judgments (*e.g.*, whether the music is in the public domain, licensed, or a fair use) that the safe-harbor provisions were specifically designed to avoid.

*First*, as the district court noted, the issue does not involve any factual dispute:

> There is no real dispute about the content of the videos: they contain visual images set to copyrighted songs played essentially in their entirety. Determining whether [Vimeo] had "red flag" knowledge turns largely on the construction of 17 U.S.C. § 512 and the Circuit's opinion in *Viacom*. The Circuit could, in this Court's view, resolve the proposed question "quickly and cleanly without having to study the record."

Ex. B at 21 (quoting *In re Worldcom, Inc.*, No. M-47, 2003 WL 21498904, at *10 (S.D.N.Y. Jun. 30, 2003)). Thus, resolution of this issue turns on statutory interpretation, informed by the text and legislative history of the DMCA and the relevant case law of this Court and other federal courts.

*Second*, the legal issue is dispositive. For 18 of the videos initially at issue, the district court denied summary judgment on the ground that Vimeo's mere watching of a user-generated video containing a "recognizable" song automatically raises a triable issue as to whether Vimeo had "red flag" knowledge that the use of music was infringing. Ex. B at 9. Respondents' amended complaints add up to 475 claims based upon the same type of knowledge—*i.e.*, knowledge of the existence of the video and its contents, not actual knowledge of infringement. *See*

15

*id.* at 22.  Reversal of the "decision on the issue of 'red flag' knowledge could lead to a grant of summary judgment in favor of [Vimeo] on most, if not all, of these instances of [alleged] infringement." *Id.* at 22.  Thus, the Court's resolution of the issue in Vimeo's favor would "importantly affect the conduct" of the litigation, *In re Duplan*, 591 F.2d at 148 n.11, for the same reasons stated in Point I.A, *supra*.

*Third*, for the reasons discussed in detail below, *see infra* Point II.B, resolution of this issue would have important precedential value. *Klinghoffer*, 921 F.2d at 24; *Credit Bancorp*, 103 F. Supp. 2d at 227.  As social media and other interactive web-based businesses grow, service providers need clear guidance as to the availability of DMCA safe harbors and their legal responsibilities thereunder. The district court correctly recognized that resolution of "these arguments will have far-reaching implications in this case and others."   Ex. B at 22 (citing *Klinghoffer*, 921 F.3d at 24).

### B.    There Is Substantial Ground For Disagreement On This Issue

This Court has yet to give guidance to service providers and the lower courts concerning the proper application of the "red flag" knowledge standard that the Court articulated in *Viacom*.  As the district court noted below, "*Viacom* defined 'red flag knowledge,' but it did not address whether content can be obviously

infringing on its face or how that concept interacts with various possible defenses to infringement, such as 'fair use.'"  Ex. B at 22.[7]

Moreover, the authority that does exist on this question is in tension with the holding below, as the district court itself acknowledged.  Other "courts have observed[] that a service provider may not be able to determine whether a particular work is infringing solely by the act of viewing it."  Ex. A at 32 (citing cases).  For example, the *Viacom* district court noted:

> [T]he infringing works in suit may be a small fraction of millions of works posted by others on the service's platform, *whose provider cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a "fair use" of the material, or even whether its copyright owner or licensee objects to its posting.* The DMCA is explicit: it shall not be construed to condition "safe harbor" protection on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity …." *Id.* § 512(m)(1); *see* Senate Report at 44, House Report at 53.

*Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010) (emphasis added); *see also, e.g.*, *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007) (rejecting argument that a service provider's awareness that its service hosted websites named "illegal.net" and "stolencelebritypic.com" amounted to "red flag" knowledge of infringement); *MP3tunes*, 821 F. Supp. 2d at

---

[7]  A user may copy an entire copyrighted work if the use is fair.  *See*, *e.g.*, *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013) (incorporation of entire photographs into paintings held fair use as a matter of law); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (copying of works held fair use "even though the copyrighted images are copied in their entirety").

644 ("[I]f investigation is required to determine whether material is infringing, then those facts and circumstances are not 'red flags.'").  Reasonable judges thus already have differed on whether awareness of the presence of a recognizable song in an original user-generated video, without more, can raise a triable issue as to "red flag" knowledge of copyright infringement.

The September 18 Order below likewise conflicts with Congress's intent as set forth in the legislative history of the DMCA.  In drafting the DMCA's "red flag" provision,[8] Congress recognized the difficulty service providers face in assessing whether user-posted content infringes copyright.  While Congress wanted service providers to remove the most blatant, obvious examples of infringement, it did not want to punish service providers for reviewing material on their websites.  *See* S. Rep. at 48-49 ("red flag" knowledge standard "should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention").  Congress thus made clear that "red flag" knowledge cannot be attributed to a service provider merely from becoming aware of content that *might* be infringing:

> A directory provider [does not acquire "red flag" knowledge] merely because it saw one or more well known photographs of a celebrity at a site devoted to that person.  The provider could not be expected, during the course of its brief cataloguing visit, to determine whether

---

[8]  17 U.S.C. § 512(c)(1)(A)(ii) states that a service provider shall not be liable for copyright infringement based on user-posted material if it "is not aware of facts or circumstances from which infringing activity is apparent."

the photograph was still protected by copyright or was in the *public domain*; if the photograph was still protected by copyright, whether the use was *licensed*; and if the use was not licensed, whether it was permitted under the *fair use* doctrine.

S. Rep. at 48 (emphases added).[9]  As the district court acknowledged (*see* Ex. B at 22), its ruling is in tension with this legislative history because it places service providers in the difficult position, every time they encounter an entire song in a video, of making "discriminating judgments" (S. Rep. at 49) about whether the song is (1) in the public domain, (2) licensed or otherwise approved, or (3) a permissible fair use.[10]

Indeed, Respondents' own affiliates have elsewhere agreed that it is difficult to determine whether the use of an entire "recognizable" song in a video is licensed or a fair use based solely upon its presence.  *See* Appellants' First Brief on Cross-Appeal at 33-34, *Lenz v. Universal Music Corp.*, No. 13-16106(L), Dkt. 23 (9th Cir. Oct. 9, 2013) (music in YouTube videos: "Evaluating fair use is not an 'I

---

[9]  While this safe-harbor legislative history is contained in a discussion of what became 17 U.S.C. § 512(d), its reasoning is equally applicable to § 512(c).  *See* S. Rep. at 48 (equating "red flag" standards of §§ 512(c) and (d)); *Viacom*, 718 F. Supp. 2d at 522 (legislative history of § 512(d) is "instructive" as to § 512(c)).

[10]  Although the question here is framed in terms of music used in a video, the district court's ruling reaches any type of copyrighted work that could be posted on the Internet, including writings, photographs, artwork, and audiovisual materials. Under the district court's approach, a service provider's mere viewing of the "well known photograph" in Congress's example (contained, say, in a user-generated video or other work of art) would, without more, disqualify the service provider from summary judgment under the DMCA's safe harbor provisions.

know it when I see it' exercise that a copyright owner can resolve quickly and expeditiously.  It is time consuming, 'open-ended,' and indeterminate.").

In short, given the absence of authority from this Court explicating the "red flag" knowledge standard of *Viacom*, and the tension between the district court's approach below and the approaches of other courts and Congress, there is "a substantial ground for difference of opinion."  Ex. B at 22.

## C.    An Immediate Appeal May Materially Advance The Termination Of The Litigation

The amended complaints raise up to 475 distinct claims of infringement based solely on Vimeo employees' having viewed a video containing Respondents' music.  *See* Ex. B at 22.  Reversal on this issue "could lead to a grant of summary judgment in favor of [Vimeo] on most, if not all, of these instances of [alleged] infringement."  *Id.*  Interlocutory review is thus "appropriate because a definitive answer may save the Court and parties 'vast amounts of expense and time.'"  *Id.* at 23 (quoting *Am. Geophysical Union*, 802 F. Supp. at 29).  Indeed, when both issues are taken together, "the litigation may well be narrowed … to 29 instances" of alleged infringement.  *Id.* at 22-23.

## <u>CONCLUSION</u>

This Court should grant Vimeo's petition for interlocutory review of the September 18 Order.

DATED:    January 10, 2014

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: /s/ Kathleen M. Sullivan
Kathleen M. Sullivan
Robert L. Raskopf
Sanford I. Weisburst
Todd Anten
51 Madison Ave., 22nd Flr.
New York, NY  10010
Telephone: (212) 849-7000
Fax: (212) 849-7100

- and -

Michael A. Cheah
VIMEO, LLC
555 West 18th St.
New York, NY  10011
Telephone: (212) 314-7457
Fax: (212) 632-9547

*Attorneys for Petitioners*

21

## <u>CERTIFICATE OF SERVICE</u>

I, Todd Anten, a member of the Bar of this Court, hereby certify that on January 10, 2014, I caused to be electronically filed the foregoing PETITION FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b) AND FED. R. APP. P. 5 with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by emailing newcases@ca2.uscourts.gov pursuant to Second Circuit Local Rule 25.1(c)(2).  I further certify that on January 10, 2014, I caused to be served, by e-mail, as agreed to by the parties in writing, and by U.S. mail, copies of the foregoing on counsel of record at the following addresses:

> Russell J. Frackman
> rjf@msk.com
> Marc E. Mayer
> mem@msk.com
> MITCHELL SILBERBERG & KNUPP LLP
> 11377 W. Olympic Boulevard
> Los Angeles, CA  90064
>
> Christine Lepera
> ctl@msk.com
> Jeffrey M. Movit
> jmm@msk.com
> MITCHELL SILBERBERG & KNUPP LLP
> 12 East 49th Street, 30th Fl.
> New York, NY  10017

Dated: January 10, 2014

/s/     Todd Anten
Todd Anten

# EXHIBIT A

```
                                    ┌─────────────────────────────┐
                                    │ USDC-SDNY                   │
                                    │ DOCUMENT                    │
UNITED STATES DISTRICT COURT        │ ELECTRONICALLY FILED        │
SOUTHERN DISTRICT OF NEW YORK       │ DOC #:                      │
                                    │ DATE FILED:  9/18/13        │
                                    └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                           :

CAPITOL RECORDS, LLC, et al.,       :

                           :

                Plaintiffs,   :       OPINION AND ORDER

                           :

        -v-          :       No. 09 Civ. 10101 (RA)

                           :

VIMEO, LLC d/b/a VIMEO.COM, et al.,   :

                           :

                Defendants.  :

                           :

---------------------------------------------------------X
                           :

EMI BLACKWOOD MUSIC, INC, et al.,   :

                           :

                Plaintiffs,   :

        -v-          :       No. 09 Civ. 10105 (RA)

                           :

VIMEO, LLC d/b/a VIMEO.COM, et al.,   :

                           :

                Defendants.  :

                           :

---------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

Plaintiffs Capitol Records, LLC, Caroline Records, Inc., Virgin Records America, Inc. (collectively, "Capitol"), EMI Blackwood Music, Inc., EMI April Music, Inc., EMI Virgin Music Inc., Colgems-EMI Music, Inc., EMI Virgin Songs, Inc., EMI Gold Horizon Music Corp., EMI U Catalog, Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc. and Stone Diamond Music Corporation (collectively, "EMI" and, with Capitol, "Plaintiffs") bring this copyright infringement action against Defendants Vimeo, LLC and Connected Ventures, LLC (collectively, "Vimeo"). Before the Court is Vimeo's motion for summary judgment and Plaintiffs' cross-motion for partial summary judgment. For the following reasons, each motion

is granted in part and denied in part.

## I. Background

### A. The Vimeo Website

In 2004, employees of Connected Ventures, LLC, began developing an online platform that would enable users to upload, share and view original videos. (Defs.' 56.1 ¶ 2.)[1] The resulting website, called "Vimeo" and located at the URL http://vimeo.com ("the Website"), launched in 2005. (Id. ¶¶ 1-3, 6.)[2]

Vimeo differentiates itself from other video-sharing platforms by requiring that those who upload a video to the Website must have created, or at least participated in the creation of, the video. (Pls.' 56.1 ¶¶ 29, 31.) As Vimeo's President, Dae Mellencamp, explained, "Vimeo has become an online destination for filmmakers who want to share their creative works and personal moments." (Declaration of Dae Mellencamp, Sept. 7, 2012 ("Mellencamp Decl.") ¶ 3.) The diverse array of videos on the Website includes, *inter alia*, animation, documentaries and personal home videos uploaded by, *inter alia*, artists, politicians, educational institutions and entertainment companies. (Id. ¶ 5; Defs.' 56.1 ¶¶ 17, 54.)

Vimeo has grown considerably since its inception in 2004. In 2009, when this action was filed, Vimeo had twenty employees. (Mellencamp Decl. ¶ 22.) By July of this year, it had seventy-four employees. (Id.; Oral Argument Tr., July 18, 2013 ("Tr.") at 4:24-25.) As of September 2012, Vimeo was one of the top 130 most-visited websites in the world and one of the top ten online distributors of web video. (Defs.' 56.1 ¶ 16.) It has approximately 12.3 million

---

[1]     Where only one party's Rule 56.1 statement is cited, the opposing party either does not dispute that fact or has offered no admissible evidence to controvert it.

[2]     In 2008, Connected Ventures, LLC contributed the assets pertaining to the Website to Vimeo, LLC. (Defs.' 56.1 ¶ 3.)

registered users in forty-nine countries.  (Id. ¶¶ 15, 18.)  Each day, approximately 43,000 new videos are uploaded to Vimeo's database, which now contains more than 31.7 million videos. (Id. ¶ 18.)

### B.  How Vimeo Works

Any Internet user may access and view videos on the Website free of charge.  (Id. ¶ 7.) To upload a video, however, a user must register for an account on the Website.  (Id. ¶ 9; Pls.' 56.1 ¶ 23.)  "Basic" registration can be obtained at no charge but requires a user to provide a user name, password and e-mail address and to agree to Vimeo's Terms of Service.[3]  (Defs.' 56.1 ¶ 9; Pls.' 56.1 ¶ 23.)  Basic registration affords users access to certain features on the Website, such as the ability to "like" or comment on videos.  (Pls.' 56.1 ¶ 23.)  Alternatively, a user can purchase a "Vimeo Plus" or "Vimeo PRO" subscription that affords them additional benefits such as increased file storage and advanced customization options. (Defs.' 56.1 ¶ 62.)  The "vast majority" of Vimeo's revenue comes from user subscription fees, although advertising sales are also a primary revenue source.  (Id. ¶ 61.)

When uploading a video, a user can assign the video a title, a description and a series of "tags" (i.e., keywords associated with the video).  (Pls.' 56.1 ¶ 13.)  A user can make a video available to the general public or can limit its access through various privacy restrictions.  (Id. ¶ 25.)  For instance, a user can password-protect a video or establish a "private group" that limits access solely to group members and Vimeo employees.  (Id. ¶¶ 25, 28.)  In 2010, approximately 9.5% of videos on the Website had some form of privacy setting.  (Id. ¶ 26.)

To watch a video uploaded to the Website, a user simply selects the video, which initiates a "playback request."  (Defs.' 56.1 ¶ 14.)  The Website responds to the playback request by automatically "streaming" a copy of the requested video from Vimeo's servers to the user's

---

[3]       The relevant portions of Vimeo's Terms of Service are discussed in greater detail below.

device (e.g., laptop or cell phone) for viewing.  (Declaration of Andrew Pile, Sept. 7, 2012 ("Pile Decl.") ¶ 22.)  Streaming allows a user to begin watching a video stored on Vimeo's servers before the entire file has been transmitted.  (Defs.' 56.1 ¶ 14.)  In addition, Vimeo permits a user to download a video to his or her own device unless the video's uploader has disabled that functionality.  (Id. ¶ 14; Pls.' 56.1 ¶ 16; Pile Decl. ¶ 22.)

A registered user can also interact with videos and other Website users in several ways. For instance, in addition to "liking" and commenting on videos, a registered user can subscribe to "groups" of users who share a common interest and can create or subscribe to "channels," which are collections of videos based on theme.  (Pls.' 56.1 ¶ 19.)  All users can search the Website's index for available videos and can access its "Community Forums," "Help Center," "Staff Blog" and other pages on the Website that discuss, recommend and refer to specific videos, as well as to Vimeo's practices and guidelines.  (Id. ¶ 22.)

### C. Vimeo's Content Restrictions and Monitoring Tools

In order to register on the Website, a user must accept Vimeo's Terms of Service, which are available at a clickable link in the footer of every page on the Website and on the Website's "Help" page.  (Defs.' 56.1 ¶ 21.)  By acknowledging the Terms of Service, the user agrees not to upload videos that infringe another's rights.  (Supplemental Declaration of Michael A. Cheah, Nov. 16, 2012 ("Supp. Cheah Decl.") ¶ 11 & Exs. 6-10.)  Vimeo also has "Community Guidelines" that provide additional content restrictions and a web page dedicated to its copyright policy, both of which are incorporated by reference into its Terms of Service.  (Defs.' 56.1 ¶¶ 22, 24; Pls.' 56.1 ¶ 32.)  The web page dedicated to its copyright policy, entitled "Vimeo.com DMCA (Copyright) Notifications and Counter-Notifications Process," communicates Vimeo's policies and procedures for notifications and counter-notifications pursuant to the Digital

Millennium Copyright Act ("DMCA").  (Defs.' 56.1 ¶ 24.)  Lastly, each time a user uploads a video, the Website displays to the user the following three rules: (1) "I will upload only videos I created myself," (2) "I will not upload videos intended for commercial use," and (3) "I understand that certain types of content are not permitted on Vimeo."  (Declaration of Michael A. Cheah, Sept. 7, 2012 ("Cheah Decl.") ¶¶ 8-9 & Ex. 3.)  More information as to each rule is provided at a user's request.  (Id.)

Acknowledgement of Vimeo's Terms of Service notwithstanding, a user has the technical ability to upload any video content whether or not it complies with those Terms, and Vimeo does not pre-screen videos before they are uploaded to the Website.  (Defs.' 56.1 ¶¶ 11-12.)  Vimeo instead purports to enforce its content restriction policies through its "Community Team."  (Id. ¶¶ 27-30.)  The Community Team, which in 2012 comprised sixteen of Vimeo's seventy-four employees, reviews videos suspected of violating Vimeo's policies and can remove both videos and entire user accounts from the Website.  (Id. ¶¶ 29-30; Mellencamp Decl. ¶ 22.)  The Community Team is aided by a series of "Moderator Tools"—of which there were nearly forty in 2012—that filter suspect videos on the Website which are then reviewed by the Community Team and other Vimeo staff several times each week.  (Pls.' 56.1 ¶¶ 124-26.)  It is undisputed that Vimeo has terminated thousands of user accounts for uploading videos the content of which violated the Terms of Service.  (Defs.' 56.1 ¶ 30.)

### D.  The Videos-In-Suit and Procedural History

On December 10, 2009, Capitol and EMI—record and music publishing companies—filed separate complaints alleging, *inter alia*, direct, contributory and vicarious copyright infringement.  The complaints each contain a schedule of URLs corresponding to a total of 199 videos that had been uploaded to the Website.  (Id. ¶¶ 1-7, 69.)  Plaintiffs own copyrights to

musical recordings used in these 199 videos (hereinafter, "Videos-in-Suit"). It is undisputed for purposes of the instant motions that these musical recordings were used without authorization and infringed Plaintiffs' copyrights. (Pls.' 56.1 ¶ 7; Defs.' Resp. 56.1 at n.3.)

On May 21, 2012, Plaintiffs sought leave to amend their complaints to add over 1,000 additional allegedly infringing videos. (Defs.' 56.1 ¶¶ 70-71.) By order dated May 31, 2012, Judge Castel, to whom this case was previously assigned, denied Plaintiffs' application. (Dkt. No. 43.) Concerned that the proposed amendment would "require reopening of discovery and delay the timely adjudication of the proposed summary judgment motions," Judge Castel directed that "[t]he motion to amend may be filed within 30 days of the Court's ruling on summary judgment and the timeliness will be assessed as if the motion were made today." (Id.)

On September 7, 2012, Vimeo moved for summary judgment, asserting entitlement to "safe harbor" protection pursuant to the DMCA. On November 16, 2012, Plaintiffs cross-moved for partial summary judgment seeking a ruling that Vimeo is ineligible for such protection. The question before the Court is whether Vimeo is entitled to safe harbor protection pursuant to the DMCA.[4]

For the reasons set forth below, the Court finds that triable issues remain as to whether Vimeo is entitled to safe harbor protection as to the fifty-five of the 199 Videos-in-Suit that Vimeo employees interacted with or uploaded. Vimeo is entitled to summary judgment as to the remaining 144 Videos-in-Suit.[5]

---

[4]     The parties have filed three applications ancillary to their competing summary judgment motions. Plaintiffs have filed a motion to strike portions of one of Vimeo's affidavits. Plaintiffs also request that the Court take judicial notice of several documents. Vimeo has moved to strike Plaintiffs' 56.1 statement. The Court addresses each of these applications below in § III ("Preliminary Matters").

[5]     This holding is modified to the extent that any of the Videos-in-Suit contain Plaintiffs' infringed-upon copyrighted material that pre-dates February 15, 1972. See infra § V.C.

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact."  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor."  Id. at 340 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration."  Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011).  "Each movant must present sufficient evidence to satisfy its burden of proof on all material facts."  Morris v. N.Y.C. Emps. Ret. Sys., 129 F. Supp. 2d 599, 605 (S.D.N.Y. 2001) (citing Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988)).

## III.    Preliminary Matters

Before turning to the merits of the parties' substantive motions, the Court must address three evidentiary motions.  See Colon v. BIC USA, Inc., 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) ("[T]he court must evaluate evidence for admissibility before it considers that evidence in ruling on a summary judgment motion.").   Specifically, the Court must dispose of: (1) Plaintiffs' motion to strike portions of the Supplemental Declaration of Michael Cheah ("Supplemental Cheah Declaration"); (2) Plaintiffs' request that the Court take judicial notice of, *inter alia*, newspaper articles, Vimeo press releases and screenshots of the Website and other video-sharing

websites; and (3) Vimeo's motion to strike Plaintiffs' 56.1 statement.

### A. Plaintiffs' Motion to Strike

Plaintiffs first move to strike paragraphs 4, 6-9, 11, 15 and 19 of the Supplemental Cheah Declaration on the basis that the averments in those paragraphs regarding Vimeo's infringement policies "lack foundation, are conclusory in nature, or otherwise are wholly unsupported."[6] (Plaintiffs' Motion to Strike Portions of Supplemental Declaration of Michael A. Cheah (Dkt. 101) at 4.)  In his Supplemental Declaration, Cheah describes the Website's policies regarding the use of third-party copyrighted content in videos, its policies and procedures for DMCA compliance and Vimeo's removal of the Videos-in-Suit.

Affidavits submitted in support of or in opposition to a summary judgment motion must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); see also Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).

The Court rejects Plaintiffs' assertion that the contents of Cheah's Supplemental Declaration are unsupported.  Cheah explicitly states in his declaration that he has personal knowledge of the averments at issue through his role as Vimeo's General Counsel, in which he has responsibility for the "oversight and implementation of Vimeo's copyright policies and compliance with the online safe-harbor provisions of the Digital Millennium Copyright Act." (Cheah Decl. ¶ 1.)  Courts have found that declarations or affidavits made on such knowledge satisfy Rule 56's requirements.  See, e.g., SCR Joint Venture L.P. v. Warshawsky, 559 F. 3d 133, 138-39 (2d Cir. 2009) (finding that a witness's affidavit stating that he was a former vice

---

[6] Plaintiffs also move to strike paragraphs 2 and 5 on the basis that these statements contradict Cheah's deposition testimony.  Because the Court does not rely on these paragraphs in adjudicating the parties' substantive motions, Plaintiffs' motion to strike them is denied as moot.  See APL Co. Pte. Ltd. v. Kemira Water Solutions, Inc., 890 F. Supp. 2d 360, 373 (S.D.N.Y. 2012).

president of the defendants' business and was "fully familiar with the facts and circumstances set forth" therein satisfied the requirements of Rule 56); <u>Searles v. First Fortis Life Ins. Co.</u>, 98 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2000) (A witness "may testify as to the contents of records she reviewed in her official capacity" in preparing her affidavit in connection with summary judgment.).[7]

Based on the foregoing, the Court concludes that a "reasonable trier of fact could believe the witness had personal knowledge." <u>United States v. Tocco</u>, 135 F. 3d 116, 128 (2d Cir. 1998). Accordingly, Plaintiffs' motion to strike is denied.

### B. Plaintiffs' Request for Judicial Notice

Plaintiffs also request that the Court take judicial notice of a number of documents submitted in connection with their summary judgment motion. Because the Court has not relied on these documents in resolving the summary judgment motions, the request is denied as moot. <u>See</u> <u>Dobina v. Weatherford Int'l Ltd.</u>, 909 F. Supp. 2d 228, 258-59 (S.D.N.Y. 2012).

### C. Vimeo's Motion to Strike

Vimeo moves to strike Plaintiffs' 56.1 statement on the grounds that it is not "a short and concise statement" and that it includes "non-material facts." (Memorandum of Law in Support of Defendants' Motion to Strike Plaintiffs' Local Rule 56.1 Statement at 1.) Although Plaintiffs' ninety-page, 403-paragraph 56.1 statement is certainly lengthy, the Court does not find it to be unduly so in light of the numerous and complex issues raised in this case and the large body of evidence Plaintiffs have supplied in connection with their motion. Accordingly, the Court denies

---

[7] As to his averments regarding facts that pre-date his employment at Vimeo, Cheah explains that he has "become familiar with Vimeo's past and current products and services, DMCA policies, and processing of DMCA take down notices" in the course of his duties as Vimeo's General Counsel. (Cheah Decl. ¶ 1.) This is sufficient to establish his personal knowledge. <u>See</u> <u>Searles</u>, 98 F. Supp. 2d at 461-62 (review of relevant business records by qualified affiant satisfies personal knowledge requirement of Rule 56).

Vimeo's motion to strike Plaintiffs' 56.1 statement.[8]

## IV.    The DMCA

Congress enacted the DMCA in 1998 "to update domestic copyright law for the digital age." Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 26 (2d Cir. 2012).  Title II of the DMCA, codified at 17 U.S.C. § 512, seeks to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in a digital networked environment."  S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551 (II), at 49 (1998).  Congress recognized that "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."  S. Rep. No. 105-190, at 8 (1998).  "[B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  Id.

In furtherance of these policy considerations, Title II of the DMCA "establishe[s] a series of four 'safe harbors' that allow qualifying service providers to limit their liability for claims of copyright infringement."  Viacom, 676 F.3d at 27.  "[A] finding of safe harbor application necessarily protects a defendant from all affirmative claims for monetary relief."  Id. at 41.  "Because the DMCA safe harbors are affirmative defenses, [a defendant] has the burden of establishing that he meets the statutory requirements."  Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020, 1039 (9th Cir. 2013); see also WPIX, Inc. v. ivi, Inc., 691 F.3d 275, 278 (2d Cir. 2012).

To qualify for protection under any of the safe harbors, a party must first establish that it

---

[8]    Vimeo also raises numerous evidentiary objections to materials cited in various paragraphs of Plaintiffs' 56.1 statement.  The Court need not consider a large portion of these objections, as it has not relied on the objected-to material in adjudicating the parties' motions.  To the extent the Court has relied on such material, the Court has also considered, and overrules, Vimeo's corresponding evidentiary objections.

meets three threshold criteria.  <u>Viacom</u>, 676 F.3d at 27.  The party: "(1) must be a 'service provider' as defined by the statute; (2) must have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) must not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works."  <u>Wolk v. Kodak Imaging Network</u>, 840 F. Supp. 2d 724, 743 (S.D.N.Y. 2012).

If the service provider meets these threshold criteria, it must then establish the requirements of the safe harbor it invokes.  Here, Vimeo asserts that it qualifies for safe harbor protection pursuant to § 512(c).[9]  Section 512(c)(1) provides:

**(c) Information residing on systems or networks at direction of users.**

**(1) In general.**  A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

**(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

**(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

---

[9]     The three other DMCA safe harbors are not at issue in this litigation.  <u>See</u> § 512(a) (protecting service providers that act as conduits for transmission of material); § 512(b) (protecting service providers that provide temporary storage); and § 512(d) (protecting service providers that link users to online locations).

Id. § 512(c)(1).  Section 512(c)(2) further requires that service providers "designate[] an agent to receive notifications of claimed infringement" (commonly known as "takedown notices") from copyright holders.  Id. § 512(c)(2).[10]

## V.    Discussion

### A.    Threshold Criteria

#### 1.    Service Provider

The first threshold criterion requires Vimeo to demonstrate that it is a "service provider." For purposes of the § 512(c) safe harbor, the DMCA defines "service provider," in pertinent part, as "a provider of online services or network access, or the operator of facilities therefor."  17 U.S.C. § 512(k)(1)(B).[11]  This definition "is clearly meant to cover more than mere electronic storage lockers."  Viacom, 676 F.3d at 39.  Rather, it is "intended to encompass a broad set of Internet entities."  Wolk, 840 F. Supp. 2d at 744.  Indeed, one court commented that the DMCA defines "'service provider' . . . so broadly that [it had] trouble imagining the existence of an online service that *would not* fall under the definitions."  In re Aimster Copyright Litig., 252 F. Supp. 2d 634, 658 (N.D. Ill. 2002), aff'd, 334 F.3d 643 (7th Cir. 2003) (emphasis in original).

Unsurprisingly, therefore, courts have consistently found that websites that provide services over and above the mere storage of uploaded user content are service providers pursuant to § 512(k)(1)(B).  See, e.g., Obodai v. Demand Media, Inc., No. 11 Civ. 2503 (PKC), 2012 WL 2189740, at *3 (S.D.N.Y. June 13, 2012) (website that publishes its own content in addition to hosting and sharing users' content is a service provider); Wolk, 840 F. Supp. 2d at 744

---

[10]    The parties do not dispute that "Vimeo has designated a DMCA agent with the Copyright Office and posts DMCA contact information."  (Pls.' Resp. 56.1 ¶ 31.)

[11]    The DMCA contains an alternative definition of the term "service provider" that is applicable to a different safe harbor provision.  Because Vimeo seeks safe harbor under only § 512(c), the above-quoted definition applies. See 17 U.S.C. § 512(k); Viacom, 676 F.3d at 39.

("Because Photobucket offers a site that hosts and allows online sharing of photos and videos at the direction of users, Photobucket, like YouTube.com or Veoh.com, qualifies as a 'service provider' under § 512(k)(1)(B)."). The parties do not dispute that Vimeo is a provider of online services that hosts and distributes user material by permitting its users to upload, share and view videos. (Defs.' 56.1 ¶ 6.) Even though Vimeo's activities are not limited to such, the Court concludes that Vimeo qualifies as a service provider under § 512(k)(1)(B)'s expansive definition.

## 2.  Repeat Infringer Policy

The second threshold criterion requires Vimeo to demonstrate that it has adopted and reasonably implemented a policy for the termination, in appropriate circumstances, of users who are repeat infringers. Specifically, § 512(i)(1)(A) requires that a service provider seeking DMCA safe harbor protection show that it:

> has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers[.]

§ 512(i)(1)(A). To fulfill these requirements, "a service provider must (i) adopt a policy that provides for the termination of service access for repeat infringers; (ii) inform users of the service policy; and (iii) implement the policy in a reasonable manner." Wolk, 840 F. Supp. 2d at 744; see also Ellison v. Robertson, 357 F.3d 1072, 1080 (9th Cir. 2004). As one court observed, "[t]he purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights." Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011), reconsideration granted on other grounds, 2013 WL 1987225 (S.D.N.Y. May 14, 2013).

The following facts from the record inform the Court's analysis of each of the three requirements set forth above:

- From at or around Vimeo's inception, Vimeo required users to agree to its Terms of Service, which contained language stating that users will not use the Website to infringe any copyright or other proprietary rights, before uploading a video. (Supp. Cheah Decl. ¶ 11 & Exs. 6-10.)

- From at or around its inception, Vimeo's Terms of Service contained language warning users that Vimeo reserves the right to remove videos and terminate user accounts for violations of the Terms of Service. (Id.) Beginning no later than May 5, 2008, the Terms of Service specifically warned that Vimeo "will terminate rights of subscribers and account holders in appropriate circumstances if they are determined to be repeat infringers." (Id. ¶ 11 & Exs. 7-9.) As early as June 2007, Vimeo actually disabled user accounts upon discovery of infringing conduct. (Id. ¶ 8 & Ex. 4.)

- From at or around its inception through mid-2008, Vimeo received approximately five or fewer takedown notices a month. (Defs.' 56.1 ¶ 37.) Beginning in mid-2008, it received approximately five or fewer takedown notices a week. (Cheah Decl. ¶ 30.) During the pre-mid-2008 time frame, Vimeo employees, of which there were no more than twenty working full-time (Mellencamp Decl. ¶ 22), would identify repeat infringers by reviewing e-mail records or recalling the names of users previously implicated in a takedown notice. (Cheah Decl. ¶ 40.) Cheah, avers that user accounts violating the terms of service "were often terminated upon the receipt of the first DMCA takedown notice." (Id.)

- At some point after its inception, although the precise date is unclear, Vimeo began to employ a "three strikes" rule whereby it would terminate a user's account if the user became the subject of three separate, valid takedown notices. (Id. ¶ 34.) Under this policy, takedown notices received within three days of one another are treated as a single instance of infringement. (Id.) The e-mail address associated with the terminated account is added to a list of banned e-mail addresses that may not be used in connection with a new account. (Id. ¶ 38; Supp. Cheah Decl. Ex. 4; Tr. at 10:11-15.) In addition, when Vimeo reviews a user account pursuant to a takedown notice that identifies allegedly infringing content in a video, it also reviews the other videos in that user's account for additional violations of Vimeo's Terms of Service. (Cheah Decl. ¶ 39.) Finally, under this rule, any video that is removed pursuant to a takedown notice is placed on a "blocked video" list, which prevents any Vimeo user from re-uploading the same video file. (Id. ¶ 36; Tr. at 10:16-20.)

- In October 2008, Vimeo began utilizing a "Purgatory Tool," which facilitates the tracking of repeat infringers by collecting and maintaining all videos and accounts removed from the Website, including those removed due to DMCA takedown notices. (Pile Decl. ¶¶ 30-31.) A video that is in Purgatory is no longer accessible to anyone except Vimeo employees with "Moderator status." (Id. ¶ 32.) When a user account is placed in Purgatory, all of that user's videos are automatically placed in Purgatory as well. (Id. ¶ 33.)

Plaintiffs assert that Vimeo did not have any repeat infringer policy prior to the

implementation of the Purgatory Tool in October 2008 and that the policy adopted thereafter was not communicated to its users or reasonably implemented.  Contrary to these assertions, the Court finds that Vimeo has established each prong of the repeat infringer policy requirement.  It addresses each in turn.

### a.  Adoption of a Policy

Vimeo must first establish that it adopted a policy providing for the termination of access for repeat infringers.  This statutory requirement emanates from Congress' concern that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access."  H.R. Rep. 105-551 pt. 2, at 61 (1998).

Although the case law is sparse on what procedures are sufficient to establish the adoption of a repeat infringer policy, a court having had occasion to address the issue suggested that "[t]he fact that Congress chose not to adopt such specific provisions when defining a user policy indicates its intent to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined."  Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090, 1101 (W.D. Wash. 2004), overruled on other grounds Cosmetic Ideas, Inc. v. IAC/Interactivecorp, 606 F.3d 612 (9th Cir. 2010).

The Court agrees with the general sentiment expressed in Corbis that the threshold requirement of the adoption of a repeat infringer policy should not be an overly burdensome one to meet.  At this stage of the analysis, it appears sufficient that Vimeo demonstrate that it took a clear position that those who chose to violate another's copyright would not be permitted to avail themselves of the service Vimeo provides.

The Court finds that Vimeo, from at or around its inception, espoused a policy providing

for the termination of repeat infringers.  Vimeo's Terms of Service required users to "agree not to use the Service to . . . upload, post, email, transmit or otherwise make available any Content that infringes any patent, trademark, trade secret, copyright or other proprietary rights" and further advised that Vimeo reserved the right to remove videos and user accounts for violation of these Terms.  (Supp. Cheah Decl. ¶¶ 9, 11 & Ex. 6.)  This language reflects the adoption of a policy that users could, in appropriate circumstances, be terminated for uploading infringing content.  That Vimeo adopted such a policy is further supported by e-mails dated between June 2007 and October 2008 demonstrating that Vimeo did in fact terminate accounts upon notice of repeat infringement and, indeed, did so upon receipt of a single takedown notice.  (Supp. Cheah Decl. ¶¶ 8, 40 & Ex. 4.)

As discussed further below, Vimeo's policy became more structured and refined as Vimeo's employee roster and user base grew, but the evidence establishes that Vimeo had a policy in place that provided for the termination of service for repeat (or even first-time) infringers from the company's inception.  The DMCA requires nothing more at this threshold stage.

### b.  Informing Users of the Policy

Section 512(i)(1) also requires that a service provider "inform[] subscribers and account holders of . . . [its] policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  This language has been interpreted to require that the service provider "put users on notice that they face exclusion from the service if they repeatedly violate copyright laws."  Corbis Corp., 351 F. Supp. 2d at 1102.  The statute, however, does not "suggest what criteria should be considered by a service provider, much less require the service provider to reveal its

decision-making criteria to the user." Id.

In Obodai v. Demand Media, Inc., No. 11 Civ. 2503 (PKC), 2012 WL 2189740 (S.D.N.Y. June 13, 2012), the repeat infringer requirement was met where the defendant's Terms and Conditions provided contact information for a DMCA designated agent, provided that the defendant could terminate "any Account or user for repeated infringement . . . and [] reserve[d] the right to terminate an Account or user for even one infringement." Id. at *4; see also Perfect 10, Inc. v. CCBill, LLC, 340 F. Supp. 2d 1077, 1088-89 (C.D. Cal. 2004) (policy stating a user's access may be terminated deemed sufficient communication). From its inception, as in Obodai, Vimeo provided contact information for its DMCA designated agent, required registered users to agree not to infringe others' copyrights, and notified users that their accounts may be terminated for violation of the Terms of Service.

The Court rejects Plaintiffs' argument that Vimeo cannot establish the second prong because it did not communicate to its users a specific "repeat" infringer policy until 2011. While it is undisputed that Vimeo's formal "Repeat Infringer Policy" was not published to the Website until in or about January 2011,[12] Vimeo communicated a more general policy—threatening account termination upon any violation of the Terms of Service including single or repeated instances of infringement—from at or around its inception, and this suffices to meet the second prong of this threshold requirement.

Accordingly, the Court finds that Vimeo adequately communicated its policy to its users.

### c.  Reasonable Implementation of the Policy

Finally, § 512(i)(1)(A) requires that a service provider's repeat infringer policy be "reasonably implemented."  While the statute does not define "reasonably implemented," the

---

[12]      Although, as Vimeo notes, its Terms of Service communicated to users as early as May 2008 that repeat infringement would result in account termination.

case law provides that a reasonably implemented policy can utilize a "variety of procedures" and does not require that the service provider "affirmatively police its users for evidence of repeat infringement." Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1109-11 (9th Cir. 2007). Another court has observed that § 512(i) "does not impose an obligation on service providers to track their users in any particular way." Perfect 10, Inc. v. Google, Inc., No. CV 04-9484 (AHM), 2010 WL 9479059, at *5 (C.D. Cal. July 26, 2010).

"A substantial failure to record [infringers]" may, however, "raise a genuine issue of material fact as to the implementation of the service provider's repeat infringer policy." See CCBill, 488 F.3d at 1110; Ellison, 357 F.3d at 1080 (unreasonably implemented policy where defendant "allowed notices of potential copyright infringement to fall into a vacuum and to go unheeded"); In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003) (policy was not reasonably implemented because "by teaching its users how to encrypt their unlawful distribution of copyrighted materials [defendant] disable[d] itself from doing anything to prevent infringement"). Implementation also has been deemed unreasonable when service providers failed to terminate users who "repeatedly or blatantly infringe copyright." CCBill, 488 F.3d at 1109; Datatech Enters. LLC v. FF Magnat Ltd., No. C 12-04500 (CRB), 2013 WL 1007360, at *6 (N.D. Cal. Mar. 13, 2013) ("woefully inadequate" policy demonstrated by evidence "show[ing] that when [defendant] learned that particular users were engaged in extensive repeat infringement . . . [defendant] regularly declined to ban them despite requests from copyright holders").

The Court finds that Vimeo's repeat infringer policy was reasonably implemented. In its nascent years, Vimeo employees identified repeat infringers by reviewing e-mail records or recalling the names of users previously implicated in a takedown notice. (Cheah Decl. ¶ 40.) As

18

Cheah avers, user accounts violating the Terms of Service "were often terminated upon the receipt of the first DMCA takedown notice," (id.), and as early as June 2007, Vimeo disabled user accounts upon discovery of infringing conduct, (Supp. Cheah Decl. ¶ 8 & Ex. 4). This evidence establishes that Vimeo reasonably implemented its policy from the beginning.

The Court's finding of reasonableness is also informed by the evidence of Vimeo's business circumstances as they evolved during the relevant period. That is, the policies Vimeo implemented in the first several years of its operation, as described above, were reasonable ones in light of the fact that Vimeo was, at the time, a small service provider, the twenty full-time employees of which were tasked with processing only a trickle (zero to five) of takedown requests per month. The evidence reflects that as the flow of those requests increased, Vimeo's policy became more robust—first in the form of a "three strikes" rule and a blocked video list, implemented at some point after Vimeo's inception, and eventually in the form of the "Purgatory" tool, implemented later in October 2008. That Vimeo's enforcement mechanisms advanced in step with the realities of its growing business further supports the reasonableness of its implementation system.

Plaintiffs advance several arguments as to why Vimeo's repeat infringer policy has not been reasonably implemented. The Court finds each to be unavailing.

Plaintiffs argue that Vimeo's failure to establish an adequate repeat infringer policy resulted in repeat and blatant infringers remaining on the Website. Plaintiffs rely on the deposition testimony of Dalas Verdugo, a "Community Director" at Vimeo who assisted with DMCA compliance beginning in late 2006 or 2007. (Cheah Decl. ¶ 18; Cheah Dep. 118:17–120:8.) When asked whether he could find a list of users who had been banned as repeat infringers, Verdugo answered, "I don't believe I would be able to do that and I'm not sure who

would be able to do that." (Declaration of Russell J. Frackman (1) In Support of Plaintiffs'
Motion for Partial Summary Judgment, and (2) In Opposition to Defendants' Motion for
Summary Judgment, Oct. 12, 2012 ("Frackman Decl.") Ex. 5 ("Verdugo Dep.") at 137:4-12.)
Additionally, when asked how he ensured that the Videos-in-Suit, which were removed
following the filing of the Complaint, would not be reposted in the future, Verdugo responded
that he was "not aware of something that would allow [him] to do that." (Id. at 18:24-19:10.)
This statement reveals that Verdugo was unaware of Vimeo's "blocked video list," which it
describes as a mechanism for ensuring that a removed infringing video is not re-posted.

Verdugo's testimony certainly demonstrates a troubling ignorance of Vimeo's tools for
terminating infringing activity. Implementation, however, need not be perfect. Rather, by the
terms of the statute, it need only be "reasonable." In any event, even assuming one could infer
from Verdugo's apparent ignorance of aspects of Vimeo's tools for terminating infringement that
Vimeo's overall implementation of its policy was affected in some way, such isolated comments,
while certainly unfortunate, do not reflect the sort of "substantial failure," see CCBill, 488 F.3d
at 1110, that courts have held gives rise to a genuine dispute as to the reasonableness of a repeat
infringer policy. See Ellison, 357 F.3d at 1080; Datatech, 2013 WL 1007360, at *6; Aimster,
252 F. Supp. 2d at 659 (service provider failed to reasonably implement repeat infringer policy
when it actively blocked the collection of information on infringers and voluntarily implemented
an encryption scheme rendering impossible a determination of which users were engaged in
infringement). Indeed, Verdugo himself elsewhere testified as to the process Vimeo takes "in
general" in response to takedown notices: "when a request is received, it's forwarded to a lawyer
at Vimeo who reviews the request and determines whether it[']s sufficient, and if it[']s sufficient,
then the material is removed as per the DMCA." (Verdugo Dep. 112:20-113:7.) That process is,

no doubt, a reasonable one.

Plaintiffs also contend that Vimeo's policy of blocking only the e-mail address of a repeat infringer is insufficient because it allows a repeat infringer to set up another account using a different e-mail address. They rely on <u>A&M Records, Inc. v. Napster, Inc.</u>, C 99-05183 (MHP), 2000 WL 573136 (N.D. Cal. May 12, 2000), in which the court concluded that the defendant's repeat infringer policy was insufficient in part because it blocked only an infringer's password, rather than his or her IP address,[13] after terminating the account. <u>Id.</u> at *9-10.

At least one court has since distinguished <u>A&M Records</u> on the basis that the record in that case included evidence showing that the service provider could—and sometimes did—block IP addresses. <u>Io Grp. Inc. v. Veoh Networks, Inc.</u>, 586 F. Supp. 2d 1132, 1143-45 (N.D. Cal. 2008). The <u>Io</u> court concluded that without testimony describing a more feasible or effective alternative, the defendant's policy of blocking a terminated user's e-mail account was reasonable. <u>See id.</u> Here, too, the Court finds no evidence that Vimeo's implementation of its repeat infringer policy, which blocks e-mail addresses but not IP addresses, is unreasonable. <u>See id.</u> at 1144 ("[T]he hypothetical possibility that a rogue user might reappear under a different user name and identity does not raise a genuine issue as to the implementation of Veoh's policy.").

Finally, Plaintiffs contend that Vimeo's repeat infringer policy was inadequate because it treated all notices received within a three-day period as a single instance of infringement. Plaintiffs argue that this policy "would have permitted a user to be subject to a notice on day one and have his infringing works removed, then all of the same works re-posted on day two and have all of them removed, and then all of the same works re-posted on day three and as a result

---

[13] An IP address—or Internet Protocol address—is "[t]he unique identification of the location of an end-user's computer." <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 407 n.4 (2d Cir. 2004).

incur only one strike." (Memorandum of Law of Plaintiffs (1) In Support of Motion for Partial Summary Judgment on Defendants' Defense under Section 512 of the DMCA, and (2) In Opposition to Defendants' Motion for Summary Judgment, Oct. 12, 2012 ("Pls.' Oct. 12 Mem.") at 46.) As an initial matter, Plaintiffs provide no evidence that Vimeo users actually engage in such conduct. In any event, taking Plaintiffs' hypothetical concern to its logical extreme, users who feverishly uploaded previously-removed content on a daily basis would still incur their third strike in little over a week. Finally, simply because, as Plaintiffs point out, a YouTube user may earn two separate strikes for takedown notices received only three hours apart pursuant to a policy this Court has found to be reasonable, see Viacom Int'l, Inc. v. YouTube, Inc., 718 F. Supp. 2d 514, 523 (S.D.N.Y. 2010), it does not follow that Vimeo's somewhat more lenient policy (three days, rather than two hours), creates a factual issue as to the reasonableness of that policy.

Having considered Plaintiffs' arguments regarding the adoption, communication and reasonable implementation of Vimeo's repeat infringer policy, the Court concludes that Vimeo meets the threshold requirement of § 512(i)(1)(A).

### 3. Interference with Standard Technical Measures

The final threshold criterion is that a service provider seeking protection under a DMCA safe harbor must not interfere with "standard technical measures" as defined by § 512(i)(2), which provides that:

> the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—
>
> **(A)** have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;
>
> **(B)** are available to any person on reasonable and nondiscriminatory terms; and

**(C)** do not impose substantial costs on service providers or substantial burdens on their systems or networks.

§ 512(i)(2).  "Refusing to accommodate or implement a 'standard technical measure' exposes a service provider to liability."  <u>Viacom</u>, 676 F.3d at 41.

Although Plaintiffs do not explicitly argue that Vimeo fails to meet this requirement, they do claim that Vimeo's privacy settings prevent copyright owners from collecting information needed to issue a takedown notice.  Even if Plaintiffs' claim is true, however, it is insufficient to demonstrate a service provider's failure to meet this threshold requirement because Plaintiffs have not identified a "standard technical measure" that comports with the definition above.  <u>See</u> <u>Viacom</u>, 676 F.3d at 41 ("In this case, the class plaintiffs make no argument that the content identification tools . . . constitute 'standard technical measures,' such that YouTube would be exposed to liability under § 512(i).").  Accordingly, although Plaintiffs' evidence regarding Vimeo's privacy settings may be relevant to other provisions of the DMCA, <u>see</u> <u>infra</u> § V.B.3, privacy settings do not constitute interference with standard technical measures.  <u>See</u> <u>Obodai</u>, 2012 WL 2189740, at *5.

**B.      The Safe Harbor Requirements Pursuant to § 512(c)**

Having satisfied the threshold criteria, Vimeo must next establish that it meets the requirements of § 512(c), which apply to any claims "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  § 512(c)(1).  Plaintiffs argue that Vimeo has not satisfied the requirements for safe harbor protection pursuant to § 512(c) because: (1) the infringing content in the Videos-in-Suit was not "by reason of the storage at the direction of a user"; (2) Vimeo had actual or "red flag" knowledge of infringement, or was willfully blind to it;

23

(3) Vimeo had the right and ability to control the infringement and financially benefited from it; and (4) Vimeo did not expeditiously remove infringing material. Each argument will be discussed in turn.

### 1.       "Storage at the Direction of a User"

Section 512(c) only provides a defense against infringement that is "by reason of the storage at the direction of a user." § 512(c)(1). The applicable legislative history provides that "[i]nformation that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c)." S. Rep. No. 105-190, at 43 (1998).

Plaintiffs argue that the infringing content at issue was not "stor[ed] at the direction of a user" because: (1) Vimeo employees uploaded certain of the Videos-in-Suit; and (2) videos on the Website may be downloaded and, according to Plaintiffs, are thus not "stor[ed]" as that word is used in § 512(c)(1).

### a.   Employee-Uploaded Videos

It is undisputed that ten of the 199 Videos-in-Suit were uploaded by users who were at the time, or later became, Vimeo employees. To determine whether these employee-uploaded videos may be deemed to have been stored "at the direction of a user," the Court must determine whether, under traditional principles of agency law, Vimeo's employees stored their videos as independent "users" or rather on behalf of the company as Vimeo staff. See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1161-62 (2d Cir. 1971).

Arguing that the employee-uploaded videos were being stored at the direction of Vimeo, Plaintiffs rely on Columbia Pictures Industries, Inc. v. Fung, No. CV 06-5578 (SVW), 2009 WL 6355911 (C.D.Cal. Dec. 21, 2009), aff'd in part and modified, 710 F. 3d 1020 (9th Cir. 2013),

which found an employer liable for inducement of infringement in part as a result of its employees' actions. Id. at *13. The defendants in Fung, which included several websites, employed "moderators" to run day-to-day activity on their forums. These moderators "gave technical assistance and aid in the organized forum discussions that furthered the third parties' infringement using the sites." Id. The court conducted the following agency analysis to determine that the moderators' conduct extended to the defendant websites, explaining that:

> [u]nder common law principles of agency, the "moderators" were the Defendants' agents with respect to their interactions with the online message boards and forums. Even though there is no evidence that the moderators were specifically authorized to post messages in these forums, the websites' act of designating them as "moderators" and providing them with specific forum-related powers leads a "third party reasonably [to] believe[] the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency, § 2.03 (2006) (describing "apparent authority").

Id. at *13 n.21.

Here, Plaintiffs cite evidence that Vimeo employees serve as an "editorial voice" for the Website, (Verdugo Dep. 31:25-32:13; Frackman Decl. Ex. 12 at Dep. Ex. 199),[14] and emphasize that the web pages displaying these videos indicated that the video was posted by a Vimeo employee. In all but two of the videos, the web page also included the employee's name. (Frackman Decl. Ex. 17.) Further, in several instances, a yellow box containing the word "STAFF"—the so-called "staff badge"—appeared next to the employees' user names, as it does for all actions taken by an employee on the Website. (Id.; Pls.' 56.1 ¶ 51.) Based on this evidence, Plaintiffs argue that the ten employee-uploaded videos may not fairly be characterized as stored at the direction of users but rather must be characterized as stored at the direction of Vimeo through common law agency principles.

---

[14] Citations to the deposition exhibits included in Exhibit 12 to the Frackman Declaration hereinafter will be cited simply as "Dep. Ex. __."

In response, Vimeo directs the Court to Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627 (S.D.N.Y. 2011), reconsideration granted on other grounds, 2013 WL 1987225 (S.D.N.Y. May 14, 2013), in which Judge Pauley concluded that the employees' personal use of the defendant's website could not be the basis of a direct infringement claim against the defendant. Id. at 649. In MP3tunes, it was undisputed that executives and employees of the defendant website downloaded and stored music using the website. Id. Citing testimony that the employees "maintained private accounts and used MP3tunes lockers for their personal benefit," Judge Pauley denied summary judgment to the plaintiff on its direct infringement claim because "a genuine dispute exist[ed] as to whether any of the [] songs in question were downloaded by employees in the course of their employment." Id.

On balance, it is less clear to the Court than it was to the court in Fung that a user would conclude that the employee-uploader was acting on behalf of the service provider. Reasonable minds could differ, as in MP3tunes, as to the extent to which the videos at issue here were uploaded by Vimeo employees in their personal capacities as opposed to as agents of Vimeo. Accordingly, a triable issue has been raised with respect to whether the employees were storing their content as "users" within the meaning of § 512(c) or as employees acting within the scope of their employment.

### b. Downloading

Plaintiffs next argue that because Vimeo permits downloading of videos on the Website, it does not provide "storage" pursuant to § 512(c). Plaintiffs rely on language from Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197 (C.D. Cal. 2007), which observed that downloading allowed users to "obtain 'perfect copies' of [p]laintiffs' work that can be inexpensively reproduced and distributed *ad nauseam*," and thus concluded that the plaintiff

had shown irreparable harm for purposes of granting a permanent injunction. Id. at 1218. Although that proposition is certainly true and Grokster highlights the challenges that copyright holders face in the digital age in which their works may be downloaded with ease to users' devices, these general principles do not govern the inquiry at hand—i.e., whether service providers that permit users to download content are *per se* ineligible for safe harbor protection.

Indeed, in UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006 (9th Cir. 2013), the Ninth Circuit noted that "access-facilitating processes" such as downloading are encompassed in § 512(c)'s language "by reason of the storage at the direction of a user." Id. at 1018-19. Plaintiffs have provided no case law—and the Court is not aware of any—holding or even suggesting that a service provider must be denied DMCA safe harbor protection because it allows its users to download content. The Court accordingly declines to deny safe harbor protection on this basis.

## 2. Knowledge of Infringement

The § 512(c) safe harbor is available only to a service provider that does not have knowledge of infringement on its website. § 512(c)(1). Specifically, the statute provides that a service provider may be disqualified from safe harbor protection if it possesses one of two types of knowledge. First, the service provider must not have "actual knowledge that the material . . . on the system or network is infringing." § 512(c)(1)(A)(i). Second, even without actual knowledge, a service provider may be disqualified if it was "aware of facts or circumstances from which infringing activity [was] apparent." § 512(c)(1)(A)(ii). This second category is often referred to as "red flag" knowledge or awareness. In addition, "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." Viacom, 676 F.3d at 35.

### a.  Actual or "Red Flag" Knowledge

In Viacom International, Inc. v. YouTube, Inc., 676 F.3d 19 (2d Cir. 2012), the Second Circuit clarified the relationship between actual and red flag knowledge.  First, the court affirmed the district court's holding that "the statutory phrases 'actual knowledge that material . . . is infringing' and 'facts or circumstances from which infringing activity is apparent' [both] refer to 'knowledge of specific and identifiable infringement.'"  Id. at 30 (quoting Viacom, 718 F. Supp. 2d at 523).  The court next explained that although both the actual and red flag knowledge provisions apply only to specific instances of infringement, they each "do independent work." Id. at 31.  It explained as follows:

> The difference between actual and red flag knowledge is thus not between specific and generalized knowledge, but instead between a subjective and an objective standard.  In other words, the actual knowledge provision turns on whether the provider actually or "subjectively" knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement "objectively" obvious to a reasonable person.

Id.

The Second Circuit ultimately vacated the district court's grant of summary judgment in favor of the defendant because it was "persuaded that the plaintiffs may have raised a material issue of fact regarding YouTube's knowledge or awareness of specific instances of infringement."  Id. at 34.  Viacom had presented evidence including e-mails among YouTube executives discussing uploaded content that appeared to be "clearly infringing, official broadcast footage" and "blatantly illegal."  Id.  The court held that "a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent."  Id.  Accordingly, the Second Circuit remanded, instructing the district court to determine "whether any specific

infringements of which YouTube had knowledge or awareness correspond[ed] to the clips-in-suit." Id.

To demonstrate that Vimeo had actual or red flag knowledge of the infringing content in the Videos-in-Suit, Plaintiffs point to evidence that Vimeo employees interacted with some of the videos using various features available to them on the Website.  Specifically, Plaintiffs note the fact that Vimeo employees:

- Entered comments on the designated web pages of some of the Videos-in-Suit.  Any registered user may comment on a video.  (Frackman Decl. ¶ 8 & Ex. 18; Pls.' 56.1 ¶ 19.)

- "Liked" some Videos-in-Suit by clicking a virtual button.  Any registered user may "like" a video.  (Frackman Decl. ¶ 8 & Ex. 18.)

- Placed some Videos-in-Suit on channels.  (Supplemental Declaration of Andrew Pile, Nov. 16, 2012 ("Supp. Pile Decl.") ¶ 16; Pls. 56.1 ¶ 19.)  Any user can create a channel or place a video on an existing channel, although some channels (e.g., the "Staff Picks" and "Vimeo HD" channels) can only be created and added to by employees.  (Pls.' 56.1 ¶¶ 341-42.)

- "Whitelisted" some Videos-in-Suit by disabling a function that allows users to "flag" a video he or she believes violates Vimeo's Terms of Service.  (Supp. Pile Decl. ¶ 5.)  Only staff members may whitelist videos.  (Frackman Decl. Ex. 19; Declaration of James D. Berkley, Oct. 12, 2012 ("Berkley Decl.") ¶ 38.)

- "Buried" some Videos-in-Suit by preventing them from appearing on the Website's "Discovery" tab, through which logged-in users may access a selection of currently popular videos.  (Pls.' 56.1 ¶ 138.)  The Discovery tab appears to logged-in users on the Website's home page.  (Id.)  Only staff members may bury videos.  (Supp. Pile Decl. ¶ 2.)

- Reviewed some uploaded Videos-in-Suit in "Plus" users' accounts.  (Frackman Decl. Ex. 3 ("Allen Dep.") at 164:15-166:12 & Ex. 85.)

A summary exhibit submitted by Plaintiffs indicates that Vimeo employees interacted, in one or more of the above-described ways, with fifty-five of the 199 Videos-in-Suit.  (Supplemental Declaration of James D. Berkley, Dec. 21, 2012 ("Supp. Berkley Decl.") Ex. 1.)  These videos unlawfully incorporated copyrighted music by well-known artists such as The

Beatles, The Beach Boys, The Jackson 5, Radiohead, Beyonce, Usher and Jay-Z.[15]  Plaintiffs'
chart reflects that Vimeo employees provided comments or "liked" twenty-six of the fifty-five
videos, placed two on channels, "whitelisted" twenty and "buried" four.  (Id.)  Twenty-nine of
these videos were uploaded by Plus users.  (Id.)  Included in the fifty-five videos are the ten
employee-uploaded videos previously discussed (see supra § V.B.1.a) for which there is a triable
issue as to storage "at the direction of a user."  (Id.)

Plaintiffs claim that Vimeo employees' interactions with these fifty-five Videos-in-Suit
necessitates a determination that Vimeo had actual or red flag knowledge of the videos'
infringing content.  The Court disagrees.  Despite the fact that these interactions are undisputed
and that most, if not all, of the copyrighted songs used in the videos would be characterized by
many as popular, and in some cases legendary—indeed, it is difficult to think of a song more
iconic than The Beatles' "All You Need is Love"—the Court is not prepared to hold that this
automatically compels the conclusion that the service provider, through its employees, was
aware of facts and circumstances that would make it objectively obvious to a reasonable person
that those videos were infringing.  Rather, the Court finds that a triable issue remains as to

---

[15]      The following is a complete list of the copyrighted songs (with the artists that performed them in a
parenthetical) used in the fifty-five videos with which Vimeo employees interacted: "Stars and Boulevards"
(Augustana); "Surfin' USA" (The Beach Boys); "Wouldn't It Be Nice" (The Beach Boys); "Sabotage" (Beastie
Boys); "Sure Shot" (Beastie Boys); "A Day in the Life" (The Beatles); "All You Need is Love" (The Beatles);
"Baby, You're a Rich Man" (The Beatles); "Don't Let Me Down" (The Beatles); "I'm Only Sleeping" (The
Beatles); "Octopus's Garden" (The Beatles); "She's Leaving Home" (The Beatles); "Taxman" (The Beatles);
"Crazy in Love" (Beyonce); "White Wedding" (Billy Idol); "My Love" (The Bird and the Bee); "No Rain" (Blind
Melon); "All the Small Things" (Blink-182); "Call Me" (Blondie); "Far Out" (Blur); "Girls & Boys" (Blur); "We've
Got a File on You" (Blur); "Oye Como Va" (Carlos Santana); "Genie in a Bottle" (Christina Aguilera);
"Aerodynamic" (Daft Punk); "Around the World" (Daft Punk); "Digital Love" (Daft Punk); "Words" (Doves);
"Praise You" (Fatboy Slim); "Glamorous" (Fergie); "Do You Realize??" (Flaming Lips); "Stacy's Mom" (Fountains
of Wayne); "19-2000" (Gorillaz); "DARE" (Gorillaz); "Feel Good Inc." (Gorillaz); "The Pink Panther Theme"
(Henry Mancini); "The Passenger" (Iggy Pop); "I Want You Back" (The Jackson 5); "Jane Says" (Jane's
Addiction); "Dirt Off Your Shoulder" (Jay-Z); "Universe & U" (KT Tunstall); "Simba" (Les Baxter); "In the Good
Old Summertime" (Les Paul and Mary Ford); "A Milli" (Lil Wayne); "Everything's Just Wonderful" (Lily Allen);
"Move (If You Wanna)" (Mims); "Unwritten" (Natasha Bedingfield); "Lump" (The Presidents of the United States
of America); "Peaches" (The Presidents of the United States of America); "Everything in Its Right Place"
(Radiohead); "Ghostbusters" (Ray Parker Jr.); "Tonight, Tonight" (The Smashing Pumpkins); "Fat Lip" (Sum 41);
"I Can't Help Myself (Sugar Pie Honey Bunch)" (The Four Tops); and "Love in This Club" (Usher).

whether, under the totality of the circumstances, this standard is met as to each of the fifty-five videos in question.

In so doing, the Court is also unwilling to adopt Vimeo's argument that it has met its burden with regard to the actual or red flag knowledge prong of the statute. Vimeo has not presented any evidence disputing that its employees interacted with these videos in the above-mentioned ways but rather argues that proof of these interactions is insufficient to raise a triable issue, let alone to warrant summary judgment for Plaintiffs. It contends that some evidence of its employees' interactions with the Videos-in-Suit does not suffice to prove that the employees actually watched the videos, or that, even if they did watch them, they would have acquired actual or red flag knowledge. Indeed, at oral argument, Vimeo's counsel suggested that an e-mail from a user stating, "I just uploaded to Vimeo a complete rip of a feature-length film that I didn't make at the following URL and I didn't have permission to do it," would be a "reasonable" example of information sufficient to supply a service provider with red flag knowledge. (Tr. at 28:20-29:2.) The Court declines to set the bar for a service provider's acquisition of such knowledge quite so high.

Although it is conceivable that a Vimeo employee "liked," commented on or otherwise interacted with a video without actually watching it—a proposition the Court finds dubious—Vimeo has presented no evidence indicating that this is the case as to any of the videos in question. To the contrary, Vimeo does not dispute that videos placed on the "Staff Picks" channel were watched by the employees who selected them. (Pls.' 56.1 ¶ 118.) And at least one Vimeo employee, Jonathan Marcus, testified that he watched the videos that he "liked." (Frackman Decl. Ex. 9 ("Marcus Dep.") at 92:9-16; Declaration of Katie McGregor, Nov. 16, 2012 ("McGregor Decl.") ¶ 2.)

The Court is further unpersuaded by Vimeo's contention that, even if its employees did watch the videos they interacted with, they could not have obtained actual or red flag knowledge that the videos contained infringing content as a matter of law.  It is of course true that "commercially produced music in a video . . . does not constitute *per se* copyright infringement," and that copyrighted music could be legally used in a video for a variety of reasons "such as when the material in question is used with the permission of the rights holder or in a manner that constitutes fair use."  (Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and Reply in Further Support of Defendants' Motion for Summary Judgment Pursuant to the DMCA Safe Harbor, Nov. 16, 2012 ("Defs.' Nov. 16 Mem.") at 16.)  See also Shelter Capital, 718 F.3d at 1021 ("[C]ontrary to UMG's contentions, there are many music videos that could in fact legally appear on Veoh.").  It is also true, as courts have observed, that a service provider may not be able to determine whether a particular work is infringing solely by the act of viewing it.  See CCBill, 488 F.3d at 114 (rejecting argument that a service provider's knowledge that its service hosted websites named "illegal.net" and "stolencelebritypic.com" amounted to "red flag" knowledge of infringement); Viacom, 718 F. Supp. 2d at 524 (observing that service providers "cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a 'fair use' of the material, or even whether its copyright owner or licensee objects to its posting"); MP3tunes, 821 F. Supp. 2d at 644 ("[I]f investigation is required to determine whether material is infringing, then those facts and circumstances are not 'red flags.'").

The Court is nonetheless unprepared to hold as a matter of law that a service provider may disclaim knowledge of infringing material under any circumstance short of an employee's

awareness that the uploader has no legal defense for his or her otherwise infringing conduct.[16]

That standard would collapse the distinction the DMCA makes between actual and red flag

knowledge and would run contrary to the statute's requirement that infringing content only be

"objectively obvious to a reasonable person."  See § 512(c)(1)(A)(ii); Fung, 710 F.3d at 1043

("The material in question was sufficiently current and well-known that it would have been

objectively obvious to a reasonable person that the material solicited and assisted was both

copyrighted and not licensed to random members of the public . . . .").

    Accordingly, triable issues exist as to whether Vimeo acquired actual or red flag

knowledge of the infringing content in the fifty-five videos with which Vimeo employees

interacted and summary judgment is denied as to them.  See Capitol Records, Inc. v. MP3tunes,

LLC, No. 07 Civ. 9931 (WHP), 2013 WL 1987225, at *4 (S.D.N.Y. May 14, 2013) ("Since

something less than a formal takedown notice may now establish red flag knowledge and EMI

offers communications acknowledging likely infringement, the issue of [d]efendants' red flag

knowledge cannot be resolved on summary judgment.").   "On these facts, a reasonable juror

could conclude that [Vimeo] had actual knowledge of specific infringing activity, or was at least

aware of facts or circumstances from which specific infringing activity was apparent."  Viacom,

676 F.3d at 34.

    By contrast, there is no evidence that Vimeo acquired actual or red flag knowledge as to

the 144 videos with which Vimeo employees indisputably did not interact, and Vimeo is thus

entitled to summary judgment as to these videos.

---

[16]     Consider, for example, Verdugo's testimony that he watched a video incorporating Usher's "Love in this
Club," commented on the video and admitted that he was aware that the song was performed by Usher, (Verdugo
Dep. 247:9-248:14 & Dep. Ex. 224), or the fact that a Vimeo employee whitelisted a video and added it to the
"Vimeo HD Channel" despite that the video's description stated: "I mixed it with the track 'Harder better faster
stronger' from Daft Punk live record 'Alive 2007.'" (Berkley Decl. ¶ 42 & Ex. 38).

### b. Willful Blindness

In <u>Viacom</u>, the Second Circuit held that "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." 676 F.3d at 35. As Judge Pauley recently noted, however, "<u>Viacom</u> offers little guidance on how to reconcile the tension between the doctrine of willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service providers to monitor user content." <u>MP3tunes</u>, 2013 WL 1987225, at *2. Section 512(m) of the DMCA provides that "[n]othing in [§ 512] shall be construed to condition the applicability of [the safe harbors] on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." § 512(m). Accordingly, while a service provider may lose safe harbor protection for being willfully blind to infringement, it may not be disqualified for failure to affirmatively seek out instances of infringement. Applying this doctrine, therefore, requires careful "attention to its scope." <u>Viacom Int'l Inc. v. YouTube, LLC</u>, No. 07 Civ. 2103 (LLS), 2013 WL 1689071, at *4 (S.D.N.Y. Apr. 18, 2013).

A service provider is willfully blind to infringement if it is "aware of a high probability of the fact [of infringement] and consciously avoid[s] confirming that fact." <u>Viacom</u>, 676 F.3d at 35 (quoting <u>United States v. Aina-Marshall</u>, 336 F.3d 167, 170 (2d Cir. 2003)). Plaintiffs cite to evidence suggesting that Vimeo has turned a blind eye to infringement of musical recordings on the Website. A sample of this evidence includes the following:

- Verdugo responded to a user's question that he "see[s] all the time at vime[o] videos, (for example Lip-dub) music being used that is copyrig[ht]ed, is there any problem with this?" by telling the user "[w]e allow it, however, if the copyright holder sent us a legal takedown notice, we would have to comply." (Verdugo Dep. 118:11-120:24 & Dep. Ex. 180.)

- Blake Whitman, a member of Vimeo's Community Team, responded to a question regarding Vimeo's "policy with copyrighted music used as audio for original video

content" by telling the user, "[d]on't ask, don't tell ;)."   (Frackman Decl. Ex. 4 ("Whitman Dep.") at 233:10-234:19 & Dep. Ex. 164.)

• In an internal e-mail thread discussing whether Vimeo should stop permitting "gameplay" videos (described below) and if it can disallow such videos on a legal basis, Andrew Pile, the Vice President of Product and Development at Vimeo, wrote "[l]egal is kind of a cop out in my opinion since we ignore music and say that legality doesn't matter when it comes to the uploading rules (it[']s about you making it, which these still fulfill)."  (Verdugo Dep. 122:20-126:10 & Dep. Ex. 182.)

• Andrea Allen, a member of Vimeo's Community Team, received a message from a user providing a link to a video and stating, "I have noticed several people using copyrighted music on Vimeo.  What do you do about this?"  Allen forwarded the e-mail internally with the comment "[i]gnoring, but sharing."  (Allen Dep. 258:17-259:20 & Dep. Ex. 116.)

Although undoubtedly disconcerting, these examples—none of which relates to the Videos-in-Suit—are simply insufficient to establish willful blindness of specific instances of infringement at issue in the litigation, as is required to impute knowledge.   In the DMCA context, a plaintiff may demonstrate a service provider's knowledge of infringement by demonstrating its willful blindness thereto; as in other areas of the law, willful blindness amounts to knowledge.   See Viacom, 676 F.3d at 35 ("A person is 'willfully blind' or engages in 'conscious avoidance' *amounting to knowledge* where . . . .") (emphasis added); Aimster, 334 F.3d at 650 ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally."). Logically, then, just as the knowledge prong of § 512(c) may be met only where the plaintiff is able to prove actual or red flag knowledge as to the specific infringing content at issue in the litigation, Viacom, 676 F.3d at 34, so too must proof of willful blindness be tailored to that same infringing content.  To hold otherwise—i.e., that instances of willful blindness as to infringing content collateral to the litigation are sufficient to divest a defendant of safe harbor protection— would swallow Viacom's requirement that actual or red flag knowledge be specific to the sued-upon content.  It would, as well, complicate rather than resolve the tension described above

between "willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service providers to monitor user content."  MP3tunes, 2013 WL 1987225, at *2.

Here, it is undisputed that none of the above-provided examples—or any other piece of evidence Plaintiffs assert bears on Vimeo's willful blindness to infringement—suggests that Vimeo employees were willfully blind to infringing content in any of the 199 Videos-in-Suit. Accordingly, while Plaintiffs express frustration with what they describe generally as Vimeo's "policy of willful blindness to music infringement," (Pls.' Oct. 12 Mem. at 16), the evidence they have adduced is ultimately insufficient.

Plaintiffs' reliance on the Seventh Circuit's 2003 opinion in In re Aimster Copyright Litigation, 334 F.3d 643 (7th Cir. 2003)—which they assert stands for the proposition that a service provider can be held liable for "*all* infringements on its website" based on a showing of willful blindness (Pls.' Oct. 12 Mem. at 15)—is wholly misplaced.  In that case, the service provider took affirmative steps to encrypt information that would otherwise reflect the songs being shared on its system in an attempt to "shield itself from actual knowledge of the unlawful purposes for which the service was being used."  334 F.3d at 651.  The Seventh Circuit rejected the service provider's attempts to "obtain immunity" through such means, particularly since the record was devoid of "any evidence that [Aimster] ha[d] ever been used for a noninfringing use." Id. at 653.  Here, there is no dispute that the Website has many non-infringing purposes, and, in stark contrast to the defendant in Aimster, there is no evidence that Vimeo took affirmative steps to blind itself to infringement on a wholesale basis.

What remains of Plaintiffs' willful blindness argument amounts to little more than their frustration that Vimeo did not use sophisticated monitoring technology in its possession to seek out and remove instances of infringing content.  As noted above, however, § 512(m) and

36

attendant case law make clear that service providers are under no affirmative duty to seek out infringement. See, e.g., Viacom, 676 F.3d at 35 ("DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider."); CCBill, 488 F.3d at 1113 ("The DMCA notification procedures place the burden of policing copyright infringement . . . squarely on the owners of the copyright."); UMG Recordings, Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099, 1112 (C.D. Cal. 2009) ("[T]he DMCA does not place the burden of ferreting out infringement on the service provider."). This remains the case even when a service provider has developed technology permitting it to do so. Thus, Plaintiffs' willful blindness arguments do not prevail.

### 3. Right and Ability to Control Infringing Content From Which It Financially Benefits

Section 512(c) also provides that, to obtain safe harbor protection, a service provider must "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Protection is therefore lost if a service provider (1) has the right and ability to control the infringing activity and (2) receives a financial benefit attributable to that activity. Id. For the reasons set forth below, the Court concludes that Vimeo lacked the right and ability to control infringing activity as that language has been defined by courts addressing § 512(c)(1)(B) of the safe harbor. The Court thus need not decide whether it received a financial benefit. See Io Grp., 586 F. Supp. 2d at 1150 ("Both elements must be met for the safe harbor to be denied.") (quoting Corbis Corp., 351 F. Supp. 2d at 1109).

The Second Circuit's Viacom opinion clarified what it means for a service provider to have "the right and ability to control," as the term is used in § 512(c)(1)(B). The Court held that the right and ability to control "'requires *something more* than the ability to remove or block

access to materials posted on a service provider's website.'"  Id. at 38 (quoting MP3tunes, 821 F.

Supp. 2d at 645) (emphasis added); see also Fung, 710 F.3d at 1045.  It reasoned that because the

DMCA presupposes that service providers have the ability to remove or block content—and in

fact, requires removal in the event of actual or red flag knowledge of infringement—defining the

control provision to require nothing more than the ability to remove or block content would

"render the statute internally inconsistent."  Viacom, 676 F.3d at 37.

    As the Viacom court acknowledged, the remaining question—what amounts to

"something more" than the ability to remove or block content—is a difficult one.  Id. at 38.  It

observed that:

> [t]o date, only one court has found that a service provider had the right and ability
> to control infringing activity under § 512(c)(1)(B).  In Perfect 10, Inc. v. Cybernet
> Ventures, Inc., 213 F. Supp. 2d 1146 (C.D. Cal. 2002), the court found control
> where the service provider instituted a monitoring program by which user
> websites received "detailed instructions regard[ing] issues of layout, appearance,
> and content."  Id. at 1173.  The service provider also forbade certain types of
> content and refused access to users who failed to comply with its instructions.  Id.
> Similarly, inducement of copyright infringement under Metro-Goldwyn-Mayer
> Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005) [hereinafter "Grokster"],
> which "premises liability on purposeful, culpable expression and conduct," id. at
> 937, might also rise to the level of control under § 512(c)(1)(B).  Both of these
> examples involve a service provider *exerting substantial influence on the
> activities of users*, without necessarily—or even frequently—acquiring knowledge
> of specific infringing activity.

Id. (emphasis added); see also Shelter Capital, 718 F.3d at 1030 ("[I]n order to have 'the right

and ability to control,' the service provider must 'exert[] substantial influence on the activities of

users.'") (quoting Viacom, 676 F.3d at 38).  On that precedent, the Court interprets its task here

to be to assess whether, based on the evidence in the record, a reasonable juror could find that

Vimeo "exert[ed] substantial influence on the activities of [its] users" and therefore had the right

and ability to control infringing conduct on the Website.[17]

---

[17]     Viacom also clarified that § 512(c)(1)(B) "does not include a specific knowledge requirement."  676 F.3d

In so doing, the Court finds it appropriate to use the cases cited in the above-quoted paragraph from <u>Viacom</u>—<u>Cybernet</u> and <u>Grokster</u>—as analytical guideposts, both because these cases provide the basis for Plaintiffs' arguments that Vimeo satisfies the control provision and because each supplies a distinct example of conduct which the Second Circuit has suggested could constitute "something more."[18]

### a.  <u>Cybernet</u>—Substantial Influence Through a Monitoring Program

In <u>Perfect 10, Inc. v. Cybernet Ventures, Inc.</u>, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), an adult magazine sued a service provider that supplied age verification services to a network of participating adult websites.  <u>Id.</u> at 1152-53.  The participating websites—the "users" in the context of § 512(c)(1)(B)—provided adult content for Internet viewers.  <u>Id.</u> at 1160.  These websites joined Cybernet's network, free of charge, to take advantage of age verification software that ensured that patrons of their website were of legal age.  <u>Id.</u> at 1157.  Viewers accessing the websites were automatically redirected to Cybernet's website, which required that they verify their age and pay a fee.  <u>Id.</u> at 1158.  Upon doing so, they would gain access to the network of participating websites.  <u>Id.</u>  Cybernet would then pay the participating websites a commission.  <u>Id.</u> at 1158-59.

The <u>Cybernet</u> court considered Cybernet's right and ability to control in two contexts. First, discussing the right and ability to control as an element of the plaintiff's vicarious liability claim, the court found:

---

at 38.  It reasoned that "importing a specific knowledge requirement into § 512(c)(1)(B) renders the control provision duplicative of § 512(c)(1)(A)," i.e., the knowledge provision discussed above.  <u>Viacom</u>, 676 F.3d at 36. Thus, safe harbor protection may be lost where a service provider has the right and ability to control infringing activity, even if it has no knowledge of the specific instances of infringement at issue in the litigation.

[18]     The other examples of control provided by the Second Circuit in <u>Viacom</u> are not relevant here.  <u>See</u> <u>Viacom</u>, 676 F.3d at 38 n.13 (acknowledging that control may exist "where the service provider is 'actively involved in the listing, bidding, sale and delivery' of items offered for sale or otherwise controls vendor sales by previewing products prior to their listing, editing production descriptions, or suggesting prices.") (internal quotations omitted).

> Cybernet has a monitoring program in place. Under this program, participating sites receive detailed instructions regard[ing] issues of layout, appearance, and content. Cybernet has refused to allow sites to use its system until they comply with its dictates. Most importantly, it monitors images to make sure that celebrity images do not oversaturate the content found within the sites that make up Adult Check. It forbids certain types of images. This ability to control other types of images belies any attempt to argue that Cybernet does not exercise sufficient control over its webmasters to monitor and influence their conduct or to deny copyright offenders the benefits of its service.

Id. at 1173. Thereafter, considering whether Cybernet was disqualified from seeking safe harbor protection under § 512(c) based on its right and ability to control, the court stated that "Cybernet prescreens sites, gives them extensive advice, prohibits the proliferation of identical sites, and in the variety of ways mentioned earlier exhibits precisely this slightly difficult to define 'something more.'" Id. at 1181-82.

Plaintiffs argue that Vimeo's control over user content through its monitoring program similarly amounts to "something more" than the mere ability to remove or block access to infringing materials, and that Vimeo therefore exerts the type of "substantial influence" over users' activities that compels a determination that Vimeo had the right and ability to control.

Vimeo indeed has a monitoring program implemented by its employees, the foundation of which is its Terms of Service and Community Guidelines. The Terms of Service, agreed to by all registered Vimeo users, sets forth the Website's prohibited conduct and warns users that their videos or accounts may be terminated at Vimeo's discretion. (Supp. Cheah. Decl. ¶ 11 & Exs. 6-10.) Vimeo's Community Guidelines expand upon the Terms of Service, setting forth restrictions as to the content of uploaded material. (Pls.' 56.1 ¶ 32.) For instance, the Community Guidelines prohibit, *inter alia*, unoriginal content as well as commercials, real-estate walkthroughs and "fan vids." (Id. ¶ 33.)

Members of Vimeo's Community Team—including the aforementioned Blake Whitman, Dalas Verdugo and Andrea Allen—enforce these content restrictions with the aid of Moderator Tools. (Id. ¶ 101.) Vimeo's approximately forty Moderator Tools include:

- The "Thin Ice" and "Wiretap" tools, which allow the Community Team to monitor the activities of specific users suspected of uploading content violative of Vimeo's policies. (Pls.' 56.1 ¶¶ 160, 169.)

- The "Sweet Spot" filtering tool, which searches for and lists videos the duration of which Vimeo has determined corresponds to the duration of uploaded television shows or movies. (Id. ¶ 154.)

- The "Movie Search" tool, which runs automated keyword searches for movies currently in theaters. (Id. ¶ 157.)

The record reflects that these monitoring efforts can be effective at removing undesirable content from the Website. For example, in mid-2008, Vimeo instituted a policy, communicated to Vimeo users, that it would ban "game play" videos—i.e., videos that depict screen shots of video games as they are played by Vimeo users or other individuals. (Whitman Dep. 152:2-153:6 & Dep. Ex. 131.) Following this decision, Community Team members, using Moderator Tools, began searching the Website for offending game play videos. (Verdugo Dep. 124:3-20; Whitman Dep. 151:6-11; 155:19-157:6.) To demonstrate the success of these efforts, Plaintiffs point to an e-mail from Verdugo responding to a user's complaint that his gaming video was removed. In it, Verdugo states, "[w]e are working to remove all game play videos . . . [w]e remove thousands every day and we will keep removing them." (Frackman Decl. Ex. 13 at VC032412.)

As to the videos that are compliant with Vimeo's content restrictions, the evidence demonstrates that Vimeo staff has significant discretion to manipulate the visibility of such content on the Website. (See Verdugo Dep. 122:20-123:10 & Dep. Ex. 182 (commenting in an internal e-mail that "we are just straight controlling our website," and adding that "hardline

41

Vimeo editorial fascism is important to keeping our website from becoming a trashpile.").)  In exercising such discretion, Vimeo staff members may "promote" a particular video on a popular "channel" (such as the "Staff Picks" channel), described by Verdugo as Vimeo's "version of front paging something," (Verdugo Dep. 192:7-10), "like" videos or leave positive comments on a video's web page.  As discussed above, Vimeo staff members may likewise "demote" a video through the use of a "burying" tool, the effect of which is that the video does not appear on the "Discover" tab, which displays popular videos that appear on the home screen of a logged-in user.  (Pls.' 56.1 ¶ 138.)

Finally, the record contains evidence that Vimeo staff communicated directly with some of its users regarding content, at times suggesting to them that it would tolerate the uploading of copyrighted material.  For instance, Allen responded to a question about whether a video containing copyrighted music could be uploaded by providing Vimeo's canned response for the question,[19] prefaced with, "[t]he [o]fficial answer I must give you is . . . ."  (Allen Dep. 252:8-20 & Dep. Ex. 112.)  At the bottom of the e-mail, however, she added, "[o]ff the record answer . . . go ahead and post it.  I don't think you'll have anything to worry about."  Id.  Additionally,

---

[19]    Vimeo's pre-scripted response is as follows:

While we cannot opine specifically on the situation you are referring to, adding a third party's copyrighted content to a video generally (but not always) constitutes copyright infringement under applicable laws.

Under relevant U.S. laws, should a copyright owner come across their copyrighted content on one of our sites, they can submit a takedown notification requesting that we remove the content.  This same area of law affords the operator of the site some level of protection from claims of copyright infringement, when dealing with user-generated-content.  The same protection does not apply to the actual poster of the content.

Again, we cannot provide any legal advice on this subject, so if you are genuinely concerned, we suggest you contact an attorney.

(Allen Dep. 252:8-20 & Dep. Ex. 112.)

Whitman instructed a user that "[w]e can't officially tell you that using copyright music is okay. But . . ."  (Dep. Ex. 418B.)

While the foregoing establishes that Vimeo did utilize a form of monitoring program, the Court cannot conclude, based on the record, that use of that program amounted to the exertion of substantial influence on the activities of users such that the right and ability to control test is met. Rather, Vimeo's monitoring program—which, in sum and substance, consists of the Community Team's removal of certain content from the Website with the assistance of Moderator Tools, its discretion to manipulate video visibility and its intermittent communication with users—lacks the "something more" that Viacom demands.

Absent from this program are the characteristics the court found present in Cybernet's monitoring system, including guidelines that dictated to users (i.e., the participating adult websites) "layout, appearance, and content," and Cybernet's "refus[al] to allow sites to use its system until they compl[ied] with [those] dictates."  Cybernet, 213 F. Supp. 2d at 1173.  While Vimeo's monitoring program aims to filter from the Website content that veers from its mission to provide a platform for user-created "creative works and personal moments," it does not purport to, and in practice does not, exert substantial influence over the content of the uploaded material.  To the contrary, Vimeo leaves such editorial decisions in the hands of its users.

Moreover, contrary to Plaintiffs' argument, although there is evidence demonstrating that Vimeo engaged in a concerted effort to remove "game play" videos on the Website, the evidence—including the e-mail from Verdugo claiming that thousands of game play videos had been removed—does not establish that Vimeo actually did so.  In any event, it does not necessarily follow that Vimeo had control over videos containing infringing music, or any other content, beyond its ability to remove or block it upon discovery.  To conclude that evidence of

the ability to remove certain content requires a finding of control over all such content would run contrary to § 512(m)'s dictate that a service provider's safe harbor protection is not lost for failure to "monitor[] its service or affirmatively seek[] facts indicating infringing activity." It would also potentially create the perverse result that service providers stay out of the monitoring business altogether even if monitoring efforts as to some website content might be deemed fruitful to the aims of the service provider and the copyright holder alike. See Viacom, 2013 WL 1689071, at *8 ("YouTube's decisions to restrict its monitoring efforts to certain groups of infringing clips . . . do not exclude it from the safe harbor, regardless of their motivation.").

The Court further rejects the argument that because Vimeo employees have discretion as to how they interact with content on the Website—as demonstrated through its manipulation of the visibility of certain videos—it exerts substantial influence over user activity. Indeed, it is difficult to imagine how Vimeo's staff of seventy-four (as of 2012) could, through its discretionary and sporadic interactions with videos on the Website, exert substantial influence on approximately 12.3 million registered users uploading 43,000 new videos each day. (Defs.' 56.1 ¶ 18.) Vimeo presented evidence that, as of November 2012, the "likes" of current Vimeo employees constituted approximately 0.2% of all "likes" on the Website and the comments left by current Vimeo employees constituted 1.6% of all comments. (Supp. Pile Decl. ¶ 15.) Similarly, the Staff Picks channel represents only one of the approximately 354,000 channels that were on the Website in November 2012. (Id. ¶ 16.) These statistics demonstrate that the degree of influence Vimeo exerts on user activities through its staff's promotion or demotion of user content is far from substantial; indeed, it is rather arguably *de minimis*.

Finally, the Court rejects Plaintiffs' argument that evidence of Vimeo's communication with users with respect to the Website's content reflects the right and ability to control. As noted

above, although the Court is troubled by Vimeo employees' responses to certain user questions about possible infringement, this evidence speaks less to control than to those employees' attitudes towards infringement or their knowledge of it, which the Court has already addressed. The scattered examples of communication with users simply do not demonstrate a substantial influence over users' activities.

Having considered the totality of Vimeo's monitoring program, the Court rejects Plaintiffs' arguments and finds no triable issue as to the exertion of substantial influence on user activity.

**b. Grokster—Substantial Influence through Inducement of Infringement**

Plaintiffs argue that Vimeo's substantial influence over users' activities is also demonstrated by its inducement of infringement. Conscious that the link between inducement and § 512(c)'s control provision stems from Viacom's qualified language, the Court considers Plaintiffs' inducement argument with caution. See Viacom, 676 F.3d at 38 ("[I]nducement of copyright infringement under [Grokster], which 'premises liability on purposeful, culpable expression and conduct,' . . . *might* also rise to the level of control under § 512(c)(1)(B).") (emphasis added) (quoting Grokster, 545 U.S. at 937).

In Grokster, the Supreme Court considered "under what circumstances the distributor of a product capable of both lawful and unlawful use is liable for acts of copyright infringement by third parties." 545 U.S. at 918-19. The plaintiffs sought to hold the defendants, distributors of software products that allowed computer users to share electronic files, secondarily liable for the copyright infringement of their users. Id. at 919-21. The Supreme Court rejected the defendants' argument that because their products were capable of substantial non-infringing uses, they could not be held secondarily liable absent proof that they had actual knowledge of

specific infringement and were capable of preventing it.  Id. at 933.  It held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  Id. at 936-37.  The Court provided, however, that "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject [a defendant] to liability."  Id. at 937.

Following Viacom's suggestion that inducement could establish the right and ability to control, the Ninth Circuit expounded upon the inducement theory in Columbia Pictures Industries, Inc. v. Fung, 710 F.3d 1020 (9th Cir. 2013).  In that case, the individual defendant, Fung, operated websites from which users downloaded infringing copies of the plaintiffs' copyrighted works.  Id. at 1023-24.  After finding that, under Grokster, the defendants were secondarily liable for inducing infringement, id. at 1039, the Fung court proceeded to reject their attempt for safe harbor protection on the same basis.  It found that there was:

> overwhelming evidence that Fung engaged in culpable, inducing activity like that in [Grokster].  Although Fung's inducement actions do not *categorically* remove him from protection under § 512(c), they demonstrate the substantial influence Fung exerted over his users' infringing activities, and thereby supply one essential component of the financial benefit/right to control exception to the § 512(c) safe harbor.

Id. at 1046 (emphasis in original).

Fung's conclusion that evidence of "inducement actions" does not "*categorically* remove" a service provider from § 512(c) protection is a logical one.  Reading the DMCA to mandate that a service provider lose such protection for conduct identical to that which would subject it to affirmative inducement liability would mean that any attempts by a service provider to seek safe harbor protection upon a finding of affirmative inducement liability would necessarily end before they could even begin.  Cf. Viacom, 676 F.3d at 37 ("[I]f Congress had

intended § 512(c)(1)(B) to be coextensive with vicarious liability, 'the statute could have accomplished that result in a more direct manner.'") (quoting Shelter Capital, 667 F.3d at 1045). Accordingly, even if Plaintiffs' inducement argument has some force here, the Court is skeptical that, under the circumstances of this case, inducement alone could provide an adequate basis for a finding that Vimeo had the right and ability to control.

Plaintiffs raise several arguments to support their contention that Vimeo induced infringement and therefore had the right and ability to control infringing material. The Court finds none to be compelling and rejects each in turn.

Plaintiffs first contend that Vimeo induces infringement "by example"—specifically by making videos that incorporate infringing content and by supporting and participating in group projects involving infringement. Plaintiffs point to the following evidence to support this contention:

- Vimeo employees uploaded ten of the Videos-in-Suit, each of which is assumed for purposes of this motion to contain infringing music. (Pls.' 56.1 ¶ 63.)

- One of the Videos-in-Suit was created by the "Vimeo Street Team," a group of employees at Vimeo who "create[d] videos and engage[d] with the community." (Marcus Dep. 111:11-113:12; Frackman Decl. Ex. 1 ("Lodwick Dep.") at 118:11-123:7.)

- Some Vimeo employees uploaded videos (which are not among the Videos-in-Suit) with copyrighted or unlicensed music, at least one of which has been the subject of a DMCA takedown notice. (Pls.' 56.1 ¶¶ 290-95; Frackman Decl. Ex. 7 ("Pile Dep.") at 153:21-23.)

- On two occasions, Website users who later became Vimeo employees participated in Vimeo group projects in which several users collaborated to create videos to every song in a The Beatles album. (Frackman Decl. Ex. 28 at EMI 00930; Lodwick Dep. 177:3-180:10 & Dep. Ex. 15.) Because staff badges are applied to content uploaded by Vimeo employees, including content uploaded prior to their hire, a staff badge identifies Vimeo staff members participating in these collaborations.

- A web page featuring a video entitled "Helter Skelter," which incorporated The Beatles' copyrighted recording of the same name, contained a link to a lesson offered

from the "Vimeo Video School"—created in late 2010 or early 2011 by Vimeo to offer tutorials to users. The web page to which the link directs users contained the heading, "Related lessons from Vimeo Video School" and stated, "Check out these lessons to learn more about how you can make videos like this one!" (Pls.' 56.1 ¶ 351; Frackman Decl. Ex. 10 ("Mellencamp Dep.") at 184:4-188:22 & Dep. Ex. 417.)

- Vimeo created and encouraged "lip dubs." The concept of "lip dubbing" was explained on the Website as follows: "Lip Dubbing . . . Like a music video. Shoot yourself mouthing along to a song. Then sync it with a high quality copy of the song in an editing program." (Frackman Decl. Ex. 2 ("Klein Dep.") at 167:20-168:2 & Dep. Ex. 17.) The origin of lip dubbing traces to Vimeo's co-founder, Jacob Lodwick, who uploaded to the Website a video of himself lip-synching to a commercial musical recording. Other Vimeo employees appeared in or created additional lip dubs, including a particularly popular lip dub created by the entire Vimeo staff at a holiday party. (Pls.' 56.1 ¶¶ 292, 327, 338.) Vimeo encouraged the creation of lip dubs, asking users, "Why don't YOU make one??" (id. ¶ 315), and it featured lip dubs on its home page as a "Vimeo Obsession," which has been described as "cool things that our community was making on Vimeo." (Id. ¶ 327.) Others, interested in the concept of creating their own music video to a commercial song, created similar videos and soon lip dubs were an immensely popular type of video on both the Website and other video-sharing websites. (Id. ¶ 261; Lodwick Dep. 208:8-210:17 & Dep. Ex. 21; Frackman Decl. Ex. 18.)

This evidence simply does not rise to the level of that adduced in Grokster—either in quantity or in kind. In Grokster, the record was "replete with evidence" that defendants "clearly voiced the objective that recipients use [their product] to download copyrighted works." 545 U.S. at 923-24. The examples supplied by Plaintiffs reflect no such thing. To be sure, some of the videos discussed above created by Vimeo employees (for example, Lodwick's lip dub) incorporated infringing music, and users' submissions may have often incorporated the same. But the relevant standard at issue here—inducement by way of the exertion of substantial influence on the activities of users—cannot be met by evidence of stray instances of wrongful conduct by Vimeo employees on the Website and/or a generalized effort to promote videos that incorporate music. This is so particularly in light of the Supreme Court's acknowledgement in Grokster that courts be "mindful of the need to keep from trenching on regular commerce or

discouraging the development of technologies with lawful and unlawful potential."  545 U.S. at

937.  Accordingly, the Court rejects Plaintiffs' argument that Vimeo employees' purported "by

example" conduct rises to the level of inducement.

Plaintiffs next argue that evidence of Vimeo employees' communication with, and

provision of technical assistance to, Vimeo users constitutes inducement of infringement.  To

support this argument, Plaintiffs cite to evidence that:

- A user posted a video entitled, "Julia Attempts to Lip Dub Fergie's Glamorous While Driving" and described her difficulty syncing the music with the video in the description field below the video.  Lodwick posted a comment below the user's video saying, "I will help you export with the original audio track."  (Lodwick Dep. 164:9-167:12 & Dep. Ex. 12.)

- Lodwick suggested to users through a forum post that "if they have a video with music in it, they should tag it with the word 'music' colon and then the name of that artist."  (Lodwick Dep. 186:16-187:3.)  Specifically, he wrote, "just tag the clip with music:The Beatles or music:Beck or whatever."  (Dep. Ex. 16.)

- In responding to a question about how to sync music with a video, Whitman instructed a user on a forum post that "unless you have a clap board to sync audio and the visual, it[']s usually just trial and error.  You have to get the song pretty close to start, and then just move the audio track back and forth until you get it close . . . good luck!"  (Whitman Dep. 204:24-205:21 & Dep. Ex. 154.)

- Whitman posted a comment on the Website's Help Center instructing a user to "[b]ring the music into itunes, then convert the song into AIFF, then import that file into FCP and you will be golden.  Took a while for me to figure out too."  (Frackman Decl. Ex. 28 at EMI 00571.)

- Verdugo responded to a user's inquiry about uploading lip dubbed music by writing, "[i]t[']s a pesky Windows Media problem.  If you can export your videos in another format, it should fix it."  (Berkley Decl. ¶ 70 & Ex. 66.)

- A Vimeo Video School lesson entitled, "Video 101: Editing Sound & Music with iMovie" states in part: "Then there's music.  Music does a great job setting the mood you want for your video.  To add music, click the music icon below the viewer, which will open your Music and Sound Effects libraries on the right side of the screen.  There you can choose from the iMovie and iLife Sound Effects folders as well as GarageBand and iTunes.  Once you've found the piece of music or sound effect that you're looking for, drag it into the timeline."  (Berkley Decl. ¶ 54 & Ex. 50.)

Instructing users how to engage in an infringing use may be the kind of "active step[] . . . taken to encourage direct infringement" that leads to a finding of inducement. Grokster, 545 U.S. at 936 (citation omitted). Offering technical support as to the ordinary use of a service, however, is not inducement. Id. at 937. The above-referenced evidence suggests the latter. In this case, Vimeo offered technical support as to how users could incorporate music into videos; its instructions applied to lawfully and unlawfully incorporated music alike. A conclusion that the technical assistance itself is inducement of infringement because it may be relied upon by an infringer would "compromise legitimate commerce or discourage innovation having a lawful promise." Id.[20]

Similarly, with respect to Vimeo employees' communications with users, Plaintiffs provide a handful of additional examples of Vimeo employees responding to user inquiries about copyrighted music with statements that indicate tacit, or at times explicit, acceptance of infringing uploads. To be sure, some of these communications, such as Allen's advice that a user "[g]o ahead and post" a video containing infringing content, (Allen Dep. 252:8-20 & Dep. Ex. 112), may have induced a particular user to infringe in that instance. But, again, the relevant standard here—inducement by way of exertion of substantial influence on users' activities—is not met by the limited anecdotal evidence Plaintiffs have provided. To establish the right and ability to control, there must be a showing that the service provider's substantial influence over users' activities was significantly more widespread and comprehensive.

Next, Plaintiffs argue that certain structural aspects of the Website—its privacy settings for instance—amount to inducement of infringement. The Court disagrees. Nothing in the record suggests that Vimeo's privacy settings, or any other structural aspect of the Website, were

---

[20] This conclusion notwithstanding, the fact that some of these examples implicate the popular artists The Beatles, Beck and Fergie may have some bearing on the knowledge prong of § 512(c) discussed in the preceding section.

implemented in order to enable users to upload infringing material and then restrict copyright holders' access to it. Even if there was such evidence, it does not naturally follow that the establishment of those settings on the Website would serve to induce users to infringe or would otherwise serve to exert a substantial influence over users.

Plaintiffs further contend that evidence of inducement may be found in Vimeo's failure to implement filtering technologies that could be used to locate infringing content. But as the Court explained above in response to a similar argument (see supra V.B.2.b), just because Vimeo can exercise control does not mean that it must. A holding to the contrary would conflict with the express language of § 512(m), which makes clear that service providers may not lose safe harbor protection for failure to monitor or affirmatively seek out infringement.

Plaintiffs also argue that Vimeo's intent to induce infringement is reflected through its employees' internal e-mail communications regarding the current litigation. Plaintiffs cite to e-mails in which Vimeo employees respond flippantly to Plaintiffs' efforts to thwart copyright infringement on the Website. For instance, in an e-mail sent to Whitman and Verdugo (and also to all@vimeo.com), Pile wrote: "Who wants to start the felons group, where we just film shitty covers of these songs and write 'FUCK EMI' at the end?" (Dep. Ex. 330.) His and other Vimeo employees' reactions to the lawsuit, however, are of no moment to the inquiry at hand, which concerns only whether such internal comments can establish Vimeo's exertion of substantial influence over its users' infringing activities. Undoubtedly, they could not.

Finally, Plaintiffs cite evidence that they claim demonstrates that Vimeo sought to use its supposed permissive policy toward infringement of musical recordings as a selling point to attract users from other video-sharing websites. This argument also fails to show a substantial influence on users' activities. In Grokster, the Supreme Court found inducement of infringement

based, in part, on the defendant's efforts to attract users who previously used the Napster service, a website notorious for facilitating the download of illegal content. 545 U.S. at 937-38. The record in <u>Grokster</u> included internal company documents and advertising materials aimed at capturing Napster's user-base if Napster was shut down. <u>Id.</u> at 924-25. Plaintiffs do not point to similar evidence here, such as affirmative efforts or a desire by Vimeo to attempt to position itself as a platform for infringement. Plaintiffs instead cite only to evidence that Vimeo chose not to implement the filtering technology that other video-sharing websites used and evidence that users chose Vimeo, in part, because they were able to upload videos containing infringing music.

In sum, having examined the record as a whole, the Court finds no basis to conclude that Vimeo exerted substantial influence on its users' activities through inducement. This conclusion is perhaps not surprising given the nature of Vimeo's business model as compared to the business models at issue in <u>Grokster</u> and <u>Fung</u>. Both <u>Grokster</u> and <u>Fung</u> involved peer-to-peer networks, which are ideally-suited for sharing large files and are thus attractive tools for those seeking to share and access copyrighted music and video files without authorization. <u>Grokster</u>, 545 U.S. at 920; <u>Fung</u>, 710 F.3d at 1025. The defendants in both cases provided an expansive platform for wholesale infringement. In <u>Grokster</u>, the Court noted as much, stating that that the "evidence gives reason to think that the vast majority of users' downloads are acts of infringement, and because well over 100 million copies of the software in question are known to have been downloaded . . . the probable scope of copyright infringement is staggering." 514 U.S. at 923. Similarly, in <u>Fung</u>, an expert averred that between 90 and 96% of the content of associated files available on Fung's websites were for "confirmed or highly likely copyright

infringing material." Fung, 710 F.3d at 1034 (internal quotation marks omitted). This case thus presents circumstances dramatically different in kind and smaller in scale and scope.

Accordingly, Plaintiffs' inducement argument fails.

### 4. Expeditious Removal of the Videos-in-Suit

Section 512(c)(1)(C) requires that a service provider, "upon notification of claimed infringement" as described in § 512(c)(3), which outlines the elements of a conforming takedown notice, "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."

On three occasions, Plaintiffs sent Vimeo a takedown notice and Vimeo removed the videos identified in those notices. On December 11, 2008, Vimeo received a letter from EMI identifying approximately 170 videos on the Website that infringed EMI's copyrights. (Defs.' 56.1 ¶ 51.) Vimeo removed these videos within approximately three and one-half weeks. (Id.) On June 15, 2010, EMI sent six takedown notices and the referenced videos were removed the same day. (Id. ¶ 52.) Most recently, on July 11, 2012, Vimeo removed videos after receiving a takedown notice from EMI the same day. (Id. ¶ 53.) Vimeo also removed the 199 Videos-in-Suit upon receiving the complaints in this action, although some of the Videos-in-Suit placed on one of the Website's channels remained accessible for download. (Supp. Cheah Decl. ¶¶ 13-19.)

Vimeo's removal of the videos identified in the takedown notices satisfies § 512(c)(1)(C). It cannot be disputed that Vimeo's one-day response time for Plaintiffs' June 15, 2010 and July 11, 2012 takedown notices constitutes expeditious removal. With respect to the December 11, 2008 letter identifying approximately 170 infringing videos, the Court finds that, given the number of infringing videos at issue, the three and one-half week period it took Vimeo to comply with this notice constitutes expeditious removal. See Google, Inc., 2010 WL

9479059, at *9 (finding an issue of fact as to whether a service provider expeditiously removed content when the evidence reflected that "sometimes [the defendant] waited between four and seventeen months to process a number of the [] notices, as well as evidence that some notices were not processed at all"). Moreover, because the complaints in this action did not constitute valid takedown notices, Vimeo was not obligated by § 512(c)(1)(C) to remove them. See Perfect 10, Inc. v. Amazon.com, Inc., No. CV 05-4753 AHM(SHx), 2009 WL 1334364, at * 5 (C.D. Cal. May 12, 2009) (noting that it would be an "absurd result" if "the complaint or any other pleading that contains sufficient identification of the alleged infringement could count as a DMCA notification").

### C.     Pre-1972 Recordings

Lastly, Plaintiffs argue that, even if the Court finds that Vimeo is entitled to safe harbor protection, that protection cannot extend to recordings first "fixed" (i.e., recorded) before February 15, 1972. Their argument is rooted in Section 301(c) of the Copyright Act which provides, in relevant part, that:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067.

17 U.S.C. § 301(c). Plaintiffs contend that, because application of the DMCA affects copyright holders' rights and remedies, § 301(c) precludes such application to pre-February 15, 1972 recordings.

In December 2011, the Copyright Office published a report concluding that the DMCA safe harbors do not apply to pre-1972 records. See Federal Copyright Protection for Pre-1972 Sound Recordings, (Dec. 2011), available at http://www.copyright.gov/docs/sound/pre-72-report.pdf (the "Copyright Office Report"). Although the Copyright Office Report notes that

there is "no reason" why DMCA safe harbors should not apply to the use of pre-1972 recordings, id. at 130, based on a reading of the statute it concludes that "it is for Congress, not the courts, to extend the Copyright Act to pre-1972 sound recordings," id. at 132. In UMG Recordings, Inc. v. Escape Media Grp., Inc., 964 N.Y.S.2d 106 (1st Dep't 2013), the Appellate Division reached the same conclusion after engaging in an extensive review of the statutory language and legislative histories of the relevant statutory provisions. Id. at 110-12.

The Court shares the view that "it is for Congress, not the courts, to extend the Copyright Act to pre-1972 sound recordings, both with respect to the rights granted under the Act and the limitations on those rights (such as section 512) set forth in the Act." Copyright Office Report at 132; see also UMG Recordings, Inc., 964 F.Y.S.2d at 112 (it would "be far more appropriate for Congress, if necessary, to amend the DMCA to clarify its intent, than for this Court to do so by fiat.") Accordingly, the Court grants summary judgment to Plaintiffs for all applicable Videos-in-Suit.[21]

---

[21]     One court in this district has concluded otherwise. In MP3tunes, Judge Pauley, recognizing the issue as "one of first impression," concluded "that there is no conflict between section 301 and the DMCA's safe harbors for infringement of pre-1972 recordings." 821 F. Supp. 2d at 640. Judge Pauley reasoned that although "[r]ead in context, section 301(c) is an anti-preemption provision ensuring that the grant of federal copyright protection did not interfere with common law or state rights established prior to 1972," it did not "prohibit all subsequent regulation of pre-1972 recordings." Id. at 641. He further stated that "[l]imiting the DMCA to recordings after 1972, while excluding recordings before 1972, would spawn legal uncertainty and subject otherwise innocent internet service providers to liability for the acts of third parties." Id. at 642. After the publication of the Copyright Office's report, Judge Pauley, deciding a motion to certify an interlocutory appeal in the same case, noted that his prior decision on this point "may involve a substantial ground for difference of opinion, particularly in light of the Copyright Office's recent determination that the DMCA safe harbors do not apply to pre-1972 recordings." Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931 (WHP), 2012 WL 242827, at *2 (S.D.N.Y. Jan. 9, 2012) (internal quotation marks omitted).

## VI.  Conclusion

For the foregoing reasons, a triable issue exists as to whether the ten employee-uploaded videos were "stored at the direction of a user" and as to whether Vimeo had knowledge or awareness of infringing content in the fifty-five of the 199 Videos-in-Suit with which Vimeo employees interacted.  Accordingly, Vimeo's motion for summary judgment seeking safe harbor protection is granted as to the remaining 144 Videos-in-Suit, save for those Videos-in-Suit containing infringed-upon material recorded before February 15, 1972.  Plaintiffs' cross-motion for partial summary judgment is granted solely as to Videos-in-Suit containing infringing musical recordings which were recorded prior to February 15, 1972.

A telephone conference has been scheduled for October 4, 2013 at 3:00 p.m.  The parties shall jointly call Courtroom Deputy Allison Cavale at (212) 805-0162 at that time.

The Clerk of Court is respectfully directed to close the motions at docket numbers 52, 68, 79 and 99.

SO ORDERED.

Dated:        September 18, 2013
              New York, New York

Ronnie Abrams
United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
CAPITOL RECORDS, LLC, et al.,                              :
                                                           :
                                     Plaintiffs,           :
                                                           :
                    -v-                                    :
                                                           :
VIMEO, LLC d/b/a VIMEO.COM, et al.,                        :
                                                           :
                                     Defendants.           :
                                                           :
-----------------------------------------------------------X
                                                           :
EMI BLACKWOOD MUSIC, INC, et al.,                          :
                                                           :
                                     Plaintiffs,           :
                                                           :
                    -v-                                    :
                                                           :
VIMEO, LLC d/b/a VIMEO.COM, et al.,                        :
                                                           :
                                     Defendants.           :
                                                           :
-----------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/31/13

OPINION AND ORDER

No. 09 Civ. 10101 (RA)

No. 09 Civ. 10105 (RA)

RONNIE ABRAMS, United States District Judge:

Three motions are currently pending before the Court in these consolidated cases: (1) Defendants' motion for reconsideration pursuant to Local Rule 6.3, (2) Plaintiffs' motion for leave to file amended complaints to add additional works-at-issue, and (3) Defendants' motion for certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  The Court grants Defendants' motion for reconsideration in part—awarding them summary judgment with respect to an additional seventeen of the videos at issue in the complaint (the "Videos-in-Suit")—and denies the motion as to the remaining Videos-in-Suit.  The Court grants Plaintiffs' motion for leave to file an amended complaint and certifies for interlocutory appeal its September 18, 2013 Opinion and Order (the "September 18 Order"), as amended by this Order.

# BACKGROUND

The Court's September 18 Order sets forth the full factual background of this action. See Capitol Records, LLC v. Vimeo, LLC, --- F. Supp. 2d ----, 2013 WL 5272932 (S.D.N.Y. Sept. 18, 2013).[1] Below are those facts relevant to the instant motions.

Defendants operate the website "Vimeo," a platform that permits users to upload and share videos. Vimeo distinguishes itself from other video-sharing sites by requiring users to have created, or at least have participated in the creation of, the videos they upload. As of September 2012, Vimeo hosted over 31.7 million videos, with approximately 43,000 new videos added each day. (Order at 2-3.)

Plaintiffs—record and music publishing companies—filed suit against Defendants in December 2009, asserting claims for direct, contributory, vicarious, and common law copyright infringement, as well as for inducement to infringe copyright and unfair competition. Their complaints, filed separately but substantively identical, each contained a list of the 199 Videos-in-Suit. Plaintiffs own copyrights to the musical recordings used in each of these videos and, for purposes of the present motions, Defendants do not dispute that the Videos-in-Suit used the recordings without authorization. (Defs.' Response to Pls.' 56.1 Stmt. at ¶ 2 n.3.)

The parties conducted an initial phase of discovery limited to whether any of the Videos-in-Suit were protected by the "Safe Harbor" provision of the Digital Millennium Copyright Act ("DMCA"). The Safe Harbor limits the liability of service providers for copyright infringement that occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," as long as the provider satisfies certain criteria. 17 U.S.C. § 512(c)(1). The parties filed cross-motions for summary judgment

---

[1]      Citations to the September 18 Order will be to the version uploaded to ECF, Dkt. # 119 in 09 Civ. 10101, and will take the form (Order at __). All further docket entries cited in this Opinion and Order correspond to 09 Civ. 10101.

on the issue of whether Defendants were protected by the Safe Harbor.

In its September 18 Order, the Court granted in part and denied in part both parties' motions. First, it concluded that no evidence suggested that Vimeo's employees had ever viewed the majority of the Videos-in-Suit. Because it found that Defendants had established the other elements of Safe Harbor protection as a matter of law, the Court granted Defendants summary judgment on these instances of infringement. Second, the Court determined that a triable issue existed as to whether Defendants had satisfied the Safe Harbor elements for a second set of Videos-in-Suit. This set consisted of videos with which Vimeo's employees had interacted, because the Safe Harbor requires that service providers not be "aware of facts or circumstances from which infringing activity is apparent." See 17 U.S.C. § 512(c)(1)(A)(ii). It also consisted of videos uploaded by Vimeo employees, because the Safe Harbor only extends to material stored "at the direction of a user." See 17 U.S.C. § 512(c)(1). The Court denied summary judgment to both parties with respect to this set of videos. Third, the Court concluded that the Safe Harbor did not extend to videos containing music recorded before February 15, 1972. Plaintiffs were granted summary judgment on the Safe Harbor issue with respect to these Videos-in-Suit.

The Court thus granted Defendants summary judgment with respect to "144 Videos-in-Suit, save for those Videos-in-Suit containing infringed-upon material recorded before February 15, 1972." (Order at 56.) Based on Plaintiffs' undisputed submissions regarding which videos contained pre-1972 recordings, of the 199 Videos-in-Suit, the September 18 Order granted (i) Defendants summary judgment with respect to 136 Videos-in-Suit; (ii) neither party summary judgment with respect to forty-three Videos-in-Suit; and (iii) Plaintiffs summary judgment on the

Safe Harbor issue with respect to the other twenty Videos-in-Suit.[2]

## DISCUSSION

### 1. Motion for Reconsideration

The standard for granting a motion for reconsideration under Local Rule 6.3 "is strict."

In re Optimal U.S. Litig., 886 F. Supp. 2d 298, 311 (S.D.N.Y. 2012). Generally, a court will

deny reconsideration "unless the moving party can point to controlling decisions or data that the

court overlooked—matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.

1995). Courts may also grant reconsideration because of an "intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.

1992). A motion for reconsideration "is not an opportunity to advance new facts, issues or

arguments not previously presented to the Court, nor is it a substitute for appeal." In re Optimal,

886 F. Supp. 2d at 312 (footnote omitted).

As noted above, in its September 18 Order the Court cited evidence that Vimeo's

employees had interacted with a set of the Videos-in-Suit containing copyrighted music and,

from this evidence together with the nature of the videos themselves, determined that a

reasonable juror could conclude that Defendants were "aware of facts or circumstances from

which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii). Such awareness—known as

"red flag" knowledge—would disqualify Defendants from Safe Harbor protection. See Viacom

Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 31 (2d Cir. 2012). The Court thus determined that

---

[2]     Compare Compl. at Schedule B (listing videos containing pre-1972 recordings), with Supplemental
Declaration of James D. Berkley, Dec. 21, 2012 ("Supp. Berkley Decl.") at Ex. 1 (listing videos with which Vimeo
employees interacted). Defendants do not dispute, for purposes of the summary judgment motion, that Schedule B
of the complaint accurately reflects which videos contain pre-1972 recordings. (Defs.' Response to Pls.' 56.1 Stmt.
¶ 3).

summary judgment was inappropriate as to these videos.  (Order at 33.)

Defendants now ask the Court to reconsider its decision as to thirty-five such videos.
(See Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 3 & n.1.)
They raise two challenges.  First, they assert that no evidence shows that their employees ever
viewed fifteen of those thirty-five videos.  Second, they argue that even assuming a Vimeo staff
member watched each of the thirty-five videos, the infringing nature of the videos was not
"'objectively' obvious to a reasonable person," as the Second Circuit has required to support a
finding of red flag knowledge.[3]  Viacom, 676 F.3d at 31.

The Court agrees with Vimeo's first argument but not its second (with the exception of
two videos, described in Subsection B).  It therefore grants summary judgment to Defendants on
seventeen of the thirty-five videos for which they seek reconsideration.

### A.      Whether Vimeo Employees Watched Fifteen of the Videos

The September 18 Order described several ways in which Vimeo's employees interacted
with videos: the employees commented on a video's page, "liked" the video, or "buried" the
video so that it no longer appeared on Vimeo's home page.  (Order at 29-30.)  For each Video-
in-Suit with which employees interacted in one of these ways, the Court concluded, a reasonable
jury could find that the employee viewed the video containing copyrighted music and had "red
flag" knowledge of its infringing nature.

The September 18 Order noted two additional ways in which employees interacted with
Videos-in-Suit.  First, although users could upload videos on Vimeo at no cost as long as they
registered for an account, users could also purchase a "Plus" membership, which entitled them to
increased file storage space and additional customization options.  (Pls.' Response to Defs.' 56.1

---

[3]      No evidence in the record supported a finding of "actual knowledge" under 17 U.S.C. § 512(c)(1)(A)(i).

Stmt. ¶ 62.) Citing evidence that Vimeo employees "[r]eviewed some uploaded Videos-in-Suit in 'Plus' users' accounts," the September 18 Order concluded that a triable issue existed as to whether Vimeo employees had "red flag" knowledge of the infringing nature of these videos. (Order at 29.)

Second, the Court noted that Vimeo employees (and only Vimeo employees) could "whitelist" videos, which precluded other users from "flagging" the videos for violating the site's Terms of Service. (Id.) Employees could whitelist an individual video or a user's entire account, in which case all of the videos the user had uploaded became whitelisted. (Supplemental Declaration of Andrew Pile, Jan. 5, 2013 ("Supp. Pile Decl."), at ¶¶ 5, 7.) The Court likewise found that a triable issue existed as to whether Vimeo's employees had "red flag" knowledge of the contents of these videos.

Of the videos as to which the Court denied both parties summary judgment, the only evidence of employee interaction with ten of the videos was that the videos had been uploaded by "Plus" users. (See Supplemental Declaration of James D. Berkley, Dec. 21, 2012 ("Supp. Berkeley Decl."), Ex. 1.) For five other videos, the only evidence of employee interaction was that they had been uploaded by "Plus" users and the users' accounts had been whitelisted. Defendants assert that the Court should grant them summary judgment as to these fifteen Videos-in-Suit, because no evidence showed that employees viewed any of the videos.

Upon further review of the record, the Court agrees with Defendants. The only evidence that Vimeo employees viewed "Plus" users' videos came from the deposition of Andrea Allen, a Vimeo community monitor. Allen, who was presented with a page showing a list of "Plus" users, stated that she believed the page was used by moderators to view videos in "Plus" users' accounts to ensure compliance with Vimeo's Terms of Service. (Declaration of Russell J. Frackman, January 6, 2013 ("Frackman Decl."), Ex. 3 at 165:2-19 & Ex. 85.) She noted,

however, that she had never used the page, that she considered it "a dinosaur page," and that she did not "know the last time [it] was used or even talked about." (Id. 165:11-14.)

Moreover, Defendants have brought to the Court's attention evidence that "Plus" users have uploaded thirty-six percent of the videos on Vimeo, suggesting that "Plus" users are responsible for a substantial portion of the 43,000 new videos uploaded each day. (Supp. Pile Decl. ¶ 23.) It is simply unrealistic to infer that a Vimeo employee watched every "Plus" video. Indeed, Plaintiffs conceded at oral argument on the motion for reconsideration that they "don't have evidence that the particular ['Plus'] videos were viewed." (Transcript of Oral Argument, November 15, 2013 ("Oral Arg. Transcript"), at 36:23-24.) In the absence of evidence showing that a Vimeo employee watched a particular Video-in-Suit, a reasonable juror could not conclude that Defendants had knowledge of the video's contents. See Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638, 227 F.3d 29, 32-33 (2d Cir. 2000) (noting that the Court need only draw "reasonable inferences" in favor of the party opposing summary judgment). Because Defendants have satisfied the other elements of Safe Harbor protection, they are thus entitled to summary judgment with respect to the ten Videos-in-Suit for which the only evidence of employee interaction was that "Plus" users had uploaded the videos.

The Court reaches the same conclusion with respect to whitelisted videos. The only evidence Plaintiffs cite to show that Vimeo employees watched all whitelisted videos is a statement in Allen's deposition. When presented with an exhibit showing a list of videos marked as "whitelisted," Allen explained that "'White Listed' in this context would indicate to someone, a moderator looking at this, that a moderator has looked at this already" and that the video "complies with the guidelines." (Frackman Decl., Ex. 3 at 183:5-10 & Dep. Ex. 89.) But nowhere does this testimony note whether the videos had been whitelisted individually or whether they had been given that label simply because an entire user's account had been

7

whitelisted.

To be sure, a jury could infer that when a Vimeo employee whitelists a specific video, the employee has watched that video—a point Defendants do not dispute. (See Def's. Mem. of Law in Support of Motion for Reconsideration and Certification at 13-14.) But an employee's whitelisting of a user's entire account is too tenuous, without more, to permit the inference that the employee has watched all of the user's videos. Vimeo's Vice President of Product and Development averred that "[w]hen an account is whitelisted, Vimeo staff generally do not watch the videos." (Supp. Pile Decl. ¶ 7.) This assertion is consistent with Allen's testimony and is not contradicted by any other evidence in the record. Accordingly, Vimeo is also entitled to summary judgment with respect to the five videos for which the only evidence of employee interaction was that the user's account had been whitelisted.

**B.      Whether the Infringing Nature of the Videos Was Objectively Obvious**

Defendants assert that even assuming one of their employees watched each of the remaining videos, they did not have "red flag" knowledge of the videos' infringing content. This argument is focused on the provision of the Safe Harbor requiring that, in order to be protected from liability, a service provider must not be "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(ii). The Second Circuit has explained that this "red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 31 (2d Cir. 2012).

According to Defendants, the infringing nature of the remaining videos is not "obvious" because each video contains some original elements and their creators thus have at least a colorable defense that they made "fair use" of the copyrighted material. See, e.g., Cariou v. Prince, 714 F.3d 694 (2013) (holding that an artist made "fair use" of copyrighted photographs

8

when he incorporated them into a series of paintings and collages). Defendants further argue that the Court should not put service providers in the difficult position of having to decide which uses of a copyrighted work are infringing.

The Court has reviewed each of the remaining twenty videos and determines that, with respect to eighteen of the videos, a reasonable juror could—but need not—find that the infringing activity in each video was "'objectively' obvious to a reasonable person." Viacom, 676 F.3d at 31. Defendants are entitled to summary judgment on the two other videos: in each of these videos, the copyrighted songs play for only a short time in the background (approximately 38 and 57 seconds, respectively[4]) during the middle of the video and are otherwise a less significant aspect of the videos. Further, neither the name of the song nor the artist was displayed anywhere in the video or on the web page through which users could view the video. Although Plaintiffs were free to submit a "takedown notice" requesting that Vimeo remove the videos, see 17 U.S.C. § 512(c)(3), evidence of infringement in these videos was not "objectively obvious."

A juror could reach the opposite conclusion with respect to the other eighteen videos. In the Court's analysis, seventeen of these eighteen videos play all or virtually all of the copyrighted song.[5] The eighteenth video lasts for forty-eight seconds, during the entirety of which the song "Stacy's Mom" by the artist "Fountains of Wayne" plays while the lyrics appear against a blue background. (See Declaration of James D. Berkley, Jan. 6, 2013 ("Berkley Decl."), at Ex. 2.) Sixteen of these eighteen videos display both the artist and song title, either in the video itself or on the web page where viewers could access the video, and the web pages for

---

[4]     These videos incorporate the songs "All the Small Things" by Blink 182 and "Praise You" by Fatboy Slim, and are associated with Vimeo identification numbers 1889583 and 217550, respectively.

[5]     See Supp. Berkley Decl. at Ex. 1 (chart summarizing the videos with which Vimeo employees interacted); Declaration of James D. Berkley, Jan. 6, 2013, at Ex. 2 (electronic versions of Videos-in-Suit); Compl. at Schedule B (list of pre-1972 videos).

the other two videos display the copyrighted song's title. (See Frackman Decl. at Exs. 17-22.) One of these eighteen videos, titled "Christina Aguilera—Genie in a Bottle," is a full length video showing the artist performing her popular song at a concert, with the location and date of the concert displayed on the web page below the box where users can watch the video. (Id. Ex. 19 at EMI 00283). Many of the other videos are "lip-dubs," showing individuals walking through their homes or offices—or, in one case, driving a car—mouthing the words to a copyrighted song while it plays. (See Berkley Decl. Ex. 2.) All of the videos play, in essentially unaltered form, what a reasonable jury could deem recognizable songs by well-known artists.

Defendants' argument for reconsideration focuses on the Safe Harbor's legislative history. They emphasize a portion of the Senate and House Reports (the "Reports") addressing a provision of the Safe Harbor not at issue here, § 512(d), which provides a safe harbor for service providers—such as search engines—that offer "information location tools." As with § 512(c), which is the focus of this action, § 512(d) disqualifies providers from Safe Harbor protection if they "turned a blind eye to 'red flags' of obvious infringement." S. Rep. No. 105-190, at 48 (1998) ("S. Rep."); H.R. Rep. No. 105-551, pt. 2, at 57 (1998) ("H. Rep."). The Reports note that a copyright holder could show "red flag" knowledge if it demonstrated that the provider knowingly linked to a "pirate" website that provides music and movies for download; "[a]bsent such 'red flags' or actual knowledge," the Committees explained, "a directory provider would not be similarly aware merely because it saw one or more well known photographs of a celebrity at a site devoted to that person." S. Rep. at 48; H. Rep. at 57. The provider, the Reports continue, "could not be expected, during the course of its brief cataloguing visit, to determine whether the photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine." S. Rep. at 48; H. Rep. at 57-58.

10

Analogizing the example of the celebrity photograph to the use of copyrighted music in the Videos-in-Suit, Defendants assert that the September 18 Order improperly requires Vimeo to make "discriminating judgments" about what constitutes fair use—a burden Congress sought to avoid placing on service providers. (Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 10.)

Even assuming that the Reports' discussion of § 512(d) applies equally to § 512(c), however, the infringement the Reports describe is different in kind than the infringements at issue in this case. Here, the copyrighted songs were an integral part of the videos: the videos played the songs essentially unmodified and in their entirety, and the length of the video corresponded to the length of the song. A jury could conclude, based on these circumstances, that it would have been "'objectively' obvious to a reasonable person" that the individual users did not have permission to use the well-known songs in their videos. See Viacom, 676 F.3d at 31. Although a jury need not necessarily find that evidence of infringement was obvious in these videos, it certainly could reach such a conclusion in light of the length and recognizable nature of the songs.

Consider, for instance, the video of the artist Christina Aguilera.[6] This video shows the performer and television star singing her song "Genie in a Bottle" at a concert.[7] A rational juror could find that virtually every aspect of this video makes it obvious that it is infringing: the music, the lyrics, the visual image (which consists exclusively of the artist singing at her concert), and the description on the website explaining what the video is and when it was recorded.

Defendants respond that as long as a video's use of copyrighted material can

---

[6]     This video is associated with Vimeo identification number 2021311.

[7]     "Genie in a Bottle" has been described as "one of the best-selling singles of all time." See "Genie in a Bottle," http:// en.wikipedia.org/wiki/Genie_in_a_Bottle.

"conceivably be justified by a colorable claim of license or fair use," employees who view the video do not have red-flag knowledge of its infringing nature. (Defs.' Reply Mem. of Law in Support of Motion for Reconsideration and Certification at 5.) As the Court explained in its September 18 Order, however, this argument threatens to collapse the distinction between "actual" and "red flag" knowledge, rendering the latter superfluous. (Order at 33.) "Red flag" knowledge, under Defendants' construction of the statute, would seemingly require not only the upload of an unaltered, copyrighted work but also some reliable indication that the user did not have permission to upload the work, in order to negate potential legal defenses to copyright infringement. (See id. at 31.) But such evidence would be practically indistinguishable from proof of actual knowledge—that is, that the provider "actually or 'subjectively' knew of specific infringement." Viacom, 676 F.3d at 31. Presented with a copyrighted work and a statement from the user that she did not have permission to upload the file or any other legal defense, a service provider could not plausibly claim that it lacked knowledge of the specific infringement.

Perhaps recognizing the difficulty in this position, Defendants suggested at oral argument that had Vimeo's employees encountered a video that simply consisted of the upload of a feature-length film, such as "The Big Chill," those employees would have "red flag" knowledge of the video's infringing character. (Oral Arg. Transcript at 16:22-17:2.) But at least one of the videos at issue in this case seems virtually identical to "The Big Chill" example. This video appears to be the official full-length music video of the song "Move (If You Wanna)" by the artist Mims.[8] It concludes by displaying, in white font set against a black screen, the phrase "© 2009 Capitol Records. All Rights Reserved." (Berkley Decl. at Ex. 2.) Aside from its length,

---

[8]    This video is associated with Vimeo identification number 3300782. Because the only evidence Plaintiffs offered to show that a Vimeo employee interacted with the video was that it was uploaded by a "Plus" user, the Court grants Defendants summary judgment with respect to this video in this Order, despite the fact that a jury could find that it was obviously infringing. See Section 1.A, supra.

the infringing nature of this video seems indistinguishable from that of the example Defendants

provide, thus highlighting the difficulty of the Court making such determinations as a matter of

law.

Even for those videos that contain an original visual image set to the unaltered infringing

music, for purposes of the "red flag" inquiry, the Court finds no legally significant difference

between the upload of a full-length and unedited copyrighted film and the upload of a full-length

and unedited copyrighted song. A rational jury could find that a video playing the entirety of the

Four Tops' hit song "I Can't Help Myself (Sugar Pie Honey Bunch)," or a song by the Beastie

Boys, Radiohead, or Usher, provided "objectively obvious" evidence of infringement to a Vimeo

employee who viewed the video. Furthermore, as to some of the videos there is additional

evidence in the record from which a jury could find "red flag" knowledge. For example, the web

page containing one of the videos, the uploading user announced that he had "mixed [the video]

with the track 'Harder, better, faster, stronger' from Daft Punk live record 'Alive 2007.'"

(Berkley Decl. Ex. 38.) As for another video, a Vimeo employee admitted that he had watched

the video, had commented on it, and was aware that it contained music by the artist Usher.

(Frackman Decl. Ex. 5 at 247:19-248:6 & Dep. Ex. 224 (deposition of Dalas Verdugo)).

In the context of file-sharing programs, courts have consistently rejected service

providers' claims that they were unaware of infringing activity involving well-known works.

See Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1043 (9th Cir. 2013) (concluding that

a service provider had red flag knowledge when "[t]he material in question was sufficiently

current and well-known that it would have been objectively obvious to a reasonable person that

the material solicited and assisted was both copyrighted and not licensed to random members of

the public"); see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d

966, 987-88 (C.D. Cal. 2006) (finding that a service provider intended to induce copyright

infringement where it provided a search function for "Top 40 Songs," noting that "[s]uch songs are almost invariably copyrighted"). Similarly, based on the type of music the videos used here—songs by well-known artists, whose names were prominently displayed—and the placement of the songs within the video (played in virtually unaltered form for the entirety of the video), a jury could find that Defendants had "red flag" knowledge of the infringing nature of the videos.

Accordingly, the Court grants Defendants' motion for reconsideration as to seventeen of the Videos-in-Suit: the fifteen videos for there was no evidence in the record of employee interaction, and two videos where evidence of infringement was not "objectively obvious." The Court denies the motion with respect to the remaining eighteen Videos-in-Suit.

## 2.   Motion for Leave To Amend the Complaint

Plaintiffs seek leave to file an amended complaint that adds additional instances of infringement. According to their memorandum in support of the motion, the proposed amended complaint seeks to add 1476 new instances of infringement. Almost one quarter of these involve music recorded before February 15, 1972, and almost one third involve videos with which Vimeo employees interacted in one of the ways outlined in the September 18 Order.[9] (Pls.' Mem. of Law in Support of Motion to Amend at 1-3.)

Courts must "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has explained that "district courts should not deny leave unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." Friedl v. City of N.Y., 210 F.3d 79, 87 (2d Cir. 2000).

Nowhere do Defendants assert that amendment would be futile. Instead, they argue that

---

[9]      Presumably, the only evidence of employee interaction for some videos in the latter category will be that the videos were uploaded by "Plus" users or by users whose accounts had been "whitelisted." For the reasons described in this Order, Defendants will be entitled to summary judgment on those videos.

Plaintiffs have unnecessarily delayed the filing of their motion and that granting leave to amend would cause prejudice by requiring additional discovery. These arguments are unavailing.

The record shows that Plaintiffs have contemplated amending their complaint—and have made Defendants aware of their intention—from the earliest stages of the litigation. In the Case Management Plan and Scheduling Order, the parties agreed to permit Plaintiff to seek leave to amend their complaint to add additional instances of infringement, subject to Court approval, beyond the sixty-day period that otherwise limited Plaintiffs' right to amend. (Dkt. No. 24.) Plaintiffs communicated to Defendants their intention to amend in October 2010, and Defendants replied that they "d[id] not anticipate objecting to such amendment," as long as it "would be nothing more than the inclusion of additional sound recordings and musical competitions" and would not affect the first phase of discovery. (Declaration of Marc Mayer, Oct. 21, 2013 ("Mayer Decl.") at Ex. 3; Declaration of Jessica A. Rose, Nov. 4, 2013 ("Rose Decl.") at Ex. F.) Although Plaintiffs did not raise the issue of amendment again until April 24, 2012, the delay was justified: Defendants did not produce certain documents until February 8, 2011, and from March 3, 2011 to April 4, 2012 the case was stayed pending the Second Circuit's decision in Viacom. (Mayer Decl. ¶¶ 9-12; Rose Decl. ¶¶ 24, 26.) In an order dated May 31, 2012, Judge Castel (to whom the case was then assigned) noted that amending the pleading would "require reopening of discovery and delay the timely adjudication of the proposed summary judgment motions." (Dkt. No. 43.) He ruled that the "motion to amend may be filed within 30 days of the Court's ruling on summary judgment and the timeliness will be assessed as if the motion were made today." (Id.) Plaintiffs filed their motion to amend within thirty days of the Court's September 18 Order. They have not acted with undue delay.

Defendants' argument that amendment would cause them undue prejudice is similarly unpersuasive. To date, the parties have only conducted "Phase I" discovery, that is, discovery

relating to the applicability of the DMCA Safe Harbor. (See Dkt. No. 24 at 2.) Plaintiffs

represent that the only additional Phase I discovery they seek is an updated version of the

database showing the "whitelisted" and "buried" videos. (Pls.' Reply Mem. of Law in Support

of Motion to Amend at 2 n.1.) Additionally, although Defendants claim they are entitled to

additional discovery, they have not specified what information they would seek. Neither party

has given the Court any reason to believe that significant additional Phase I discovery would be

required. Plaintiffs have categorized their complaint based on the Court's September 18 Order

(noting, for instance, which compositions were recorded before 1972 and which videos were

uploaded or "liked" by Vimeo employees). (Mayer Decl. at Exs. 5-7.) To determine which new

instances of infringement survive summary judgment, the Court need only apply the principles

articulated in its September 18 Order and this Order to the remaining videos.

Finally, Defendants acknowledge that Plaintiffs have the "right" to "fil[e] a new

complaint for any alleged infringements that they neglected to include in the course of fact

discovery." (Defs.' Mem. in Opp. to Pls.' Motion to Amend at 11.) Defendants have not

identified any way in which requiring Plaintiffs to file a new action would be more efficient than

permitting them to amend their existing complaint to add new instances of infringement. See

Kwon v. Yun, 606 F. Supp. 2d 344, 365 (S.D.N.Y. 2009) (permitting defendant to amend

counterclaims in its pleading because defendant "would be free to file a new action" to recover

on its claims).

The Court therefore grants Plaintiffs' motion for leave to file amended complaints.

**3.      Motion for Certification for Interlocutory Appeal**

Vimeo asks the Court to certify for interlocutory appeal the following two questions:

> (1) Are the DMCA's safe-harbor provisions applicable to sound
> recordings fixed prior to February 15, 1972?

16

    (2) Does a service provider's mere *viewing* of a user-generated video containing third party copyrighted music automatically give rise to a triable issue of fact as to the service provider's knowledge of infringement under the DMCA?

(Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 15.) Plaintiffs do not oppose this request as long as the Court certifies "*all* of the relevant DMCA issues" for interlocutory appeal, including whether Vimeo had the "right and ability to control" infringing activity, whether it acted with "willful blindness" to infringement, and whether it had instituted a repeat infringer policy. (Pls.' Opposition to Motion for Reconsideration and Certification at 14.)

## A. Legal Standard

28 U.S.C. § 1292(b) presents a limited exception to the "basic tenet of federal law" that appellate review should be delayed until final judgment is entered. Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996). Under this provision, a district court may certify for appeal an otherwise non-appealable order when the court concludes that the order "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). District courts must "exercise great care in making a § 1292(b) certification," Westwood Pharm, Inc. v. Nat'l Fuel Gas Distrib. Corp., 964 F.2d 85, 89 (2d Cir. 1992), and should invoke the provision only in "exceptional circumstances," Coopers & Lybrand v. Livesay, 437 U.S. 463, 475 (1978).

With respect to the first prong of the test, the "'question of law' must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." Consub Delaware LLC v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007). The question must also be "controlling," meaning that reversal of the

district court's order "would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome." In re Enron Corp., No. 06 Civ. 7828(SAS), 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007).

The second prong of the test, that there exists a substantial ground for difference of opinion, is met when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." Id. "The mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." In re Flor, 79 F.3d 281, 284 (2d Cir. 1996). Rather, the district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." Id.

Courts "place particular weight" on the third factor: whether an immediate appeal will materially advance the ultimate termination of the litigation. Transp. Workers Union of Am. v. N.Y.C. Transit Auth., 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005). This requirement, which in practice is "closely connected" to the first factor, In re 650 Fifth Ave., No. 08 Civ. 10934(RJH), 2012 WL 363118, at *2 (S.D.N.Y. Feb. 2, 2012), is met when an intermediate appeal "promises to advance the time for trial or to shorten the time required for trial," Transp. Workers Union, 358 F. Supp. 2d at 350.

### B.     Whether Certification Is Appropriate

After reviewing the statutory factors, the Court concludes that two issues from its September 18 Order merit certification. The Court recognizes that § 1292(b) refers to certification of an "order," and that, should the Second Circuit agree to hear the appeal, it "may address any issue fairly included within the certified order." Yamaha Motor Corp., USA v. Calhoun, 516 U.S. 199, 205 (1996). Mindful of the Circuit's statement that "it is helpful for a

district court to frame the controlling questions of law that the order involves," United States v.
Banco Cafetero Panama, 797 F.2d 1154, 1157 (2d Cir. 1986), the Court specifies the issues it is
certifying and explains why, in its view, they satisfy the § 1292(b) criteria.

        *i.*      *Pre-1972 Recordings*

       The Court's September 18 Order granted Plaintiffs summary judgment as to those videos
that contained music recorded before February 15, 1972, concluding that the DMCA Safe Harbor
extended only to those videos that contained music recorded after that date. (Opinion at 55.)
The Court concludes that this question satisfies each of the statutory factors.

       First, this issue presents a controlling question of law. Because the issue turns almost
exclusively on a question of statutory interpretation, "the reviewing court could decide [it]
quickly and cleanly without having to study the record." Consub, 476 F. Supp. 2d at 309.
Moreover, its resolution "would materially affect the litigation's outcome." In re Enron, 2007
WL 2780394, at *1. Twenty of the videos alleged to be infringing in the existing complaint
involved pre-1972 music, (see Compl. at Schedule B) and Plaintiffs' amended complaint adds
332 videos containing pre-1972 recordings (see Mayer Decl. at Ex. 6). With respect to many of
the videos, which party prevails on the copyright claims associated with each of these recordings
rests exclusively on the reach of the Safe Harbor.

       Second, although the Court remains of the view that 17 U.S.C. § 301(c) cannot be read to
permit application of the DMCA Safe Harbor to pre-1972 recordings, the Court recognizes that
there exists a substantial ground for difference of opinion on this issue. Indeed, Judge Pauley of
this Court reached the opposite conclusion, see Capitol Records, Inc. v. MP3tunes, LLC, 821 F.
Supp. 2d 627, 640-42 (S.D.N.Y. 2011),[10] although the United States Copyright Office has

---

[10]     Although Judge Pauley noted that the question "may involve a substantial ground for difference of
opinion," he ultimately declined to certify it for interlocutory appeal because "certification would only delay the

determined that the Safe Harbor does not extend to pre-1972 recordings, see Federal Copyright Protection for Pre-1972 Sound Recordings (Dec. 2011), available at http://www.copyright.gov/ docs/sound/pre-72-report.pdf. This issue is a question of first impression in the Second Circuit, and aside from these two decisions no other federal court appears to have addressed the issue. In view of the paucity of case law and these conflicting conclusions, the Court finds that the second statutory factor has been satisfied.

Third, an intermediate appeal will materially advance the ultimate termination of the litigation. As noted above, Plaintiffs' amended complaint adds 332 instances of infringement involving pre-1972 recordings. (Mayer Decl. at Ex. 6.) If the outcome of the summary judgment motion on the current complaint—in which the Court now concludes that the DMCA Safe Harbor extends to almost three quarters of the Videos-in-Suit—is any indication, a large swath of those 332 instances of infringement will be subject to the Safe Harbor protection. Should the Second Circuit conclude that Safe Harbor protection extends to pre-1972 recordings, many of those 332 instances of infringement would be dismissed.

The Court therefore certifies for interlocutory appeal the question of "whether the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior to February 15, 1972."

    ii.    *Knowledge of Infringement*

The Court also agrees with Defendants that the issue of their "red flag" knowledge merits certification. But Defendants' articulation of the question to be certified—whether a service provider's "mere *viewing* of a user-generated video containing third party copyright music automatically give[s] rise to a triable issue of fact as to the service provider's knowledge of

---

ultimate resolution" of the case. Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931(WHP), 2012 WL 242827, at *1-*2 (S.D.N.Y. Jan. 9, 2012). Here, a decision by the Second Circuit has the potential to narrow the litigation significantly.

infringement under the DMCA" (Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 15)—misconstrues the Court's holding. The Court's conclusion that a triable issue exists as to "red flag" knowledge relies on the videos' use of recognizable songs, played essentially in their entirety and in unedited form. A more appropriate formulation of the legal question is "whether, under <u>Viacom Int'l, Inc. v. YouTube, Inc.</u>, a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song may establish 'facts or circumstances' giving rise to 'red flag' knowledge of infringement."

Phrased this way, this question—in the Court's view—satisfies the first requirement for certification. That the "red flag" knowledge inquiry depends in part on the contents of each video does not mean the question is inappropriate for certification. <u>See, e.g.</u>, <u>Am. Geophysical Union v. Texaco Inc.</u>, 802 F. Supp. 1, 11 (S.D.N.Y. 1992) (Leval, <i>J.</i>) (certifying question of whether company's photocopying of journal articles constituted "fair use" and noting that the inquiry "is highly fact-specific"). Defendants have represented that, for purposes of any interlocutory appeal, they would assume that "Vimeo had actually viewed all of the videos with which it 'interacted.'" (Defs.' Mem. of Law in Support of Motion for Reconsideration and Certification at 22 n.14.) There is no real dispute about the content of the videos: they contain visual images set to copyrighted songs played essentially in their entirety. Determining whether Defendants had "red flag" knowledge turns largely on the construction of 17 U.S.C. § 512 and the Circuit's opinion in <u>Viacom</u>. The Circuit could, in this Court's view, resolve the proposed question "quickly and cleanly without having to study the record." <u>In re Worldcom, Inc.</u>, No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

Additionally, the Court recognizes that determining whether a defendant has "red flag" knowledge of infringement is a difficult question that has important ramifications for service providers such as Vimeo. Although nothing in the Court's orders requires providers

affirmatively to police their sites for copyright infringement, see 17 U.S.C. § 512(m), the Court's interpretation of "red flag" knowledge may lead service providers to be more aggressive in further investigating or even removing copyrighted content that they encounter. Viacom defined "red flag knowledge," but it did not address whether content can be obviously infringing on its face or how that concept interacts with various possible defenses to infringement, such as "fair use."

These arguments present a substantial ground for difference of opinion. On the one hand, the legislative history of 17 U.S.C. § 512(c) suggests that service providers should not be placed in a position of having to assess the viability of a user's legal defense to copyright infringement. On the other, insulating a service provider from liability unless all conceivable defenses could be negated would effectively read the "red flag" knowledge provision out of the statute in light of the corresponding "actual knowledge" provision. Resolution these arguments will have far-reaching implications in this case and others. See Klinghoffer v. S.N.C., 921 F.2d 21, 24 (2d Cir. 1990) ("[T]he impact that an appeal will have on other cases is a factor that we may take into account in deciding whether to accept an appeal that has been properly certified by the district court.").

Finally, an appeal on this issue would "materially affect the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The amended complaint alleges 475 infringing videos with which Vimeo's employees interacted. (Mayer Decl. ¶ 15 & Exs. 5-7; Pls.' Mem. of Law in Support of Motion to Amend at 3.) Reversal of the Court's decision on the issue of "red flag" knowledge could lead to a grant of summary judgment in favor of Defendants on most, if not all, of these instances of infringement. Should the Second Circuit agree with Defendants on both the first and second certified questions, the litigation may well be narrowed from 1675 instances of infringement (the total alleged in the amended complaint, see Mayer Decl. ¶ 14) to 29

instances (the number of videos allegedly uploaded by Vimeo employees, see Mayer Decl. ¶ 15 & Exs. 5, 7; Pls. Mem. of Law in Support of Motion to Amend at 3; Capitol Records, 2013 WL 5272932, at *15). Certification of the above question is appropriate because a definitive answer may save the Court and parties "vast amounts of expense and time." Am. Geophysical Union, 802 F. Supp. at 29.

     *iii.*    *Plaintiffs' Proposed Questions*

     Plaintiffs ask the Court to certify a host of issues from its September 18 Order, at times not making any attempt to articulate a precise legal question but instead simply pointing out aspects of the Order raising "issue[s] that require[ ] clarification from the Second Circuit." (Pls.' Opposition to Motion for Reconsideration and Certification at 19.) Although the Circuit is of course free to consider any of the issues Plaintiff raises, see Yamaha Motor Corp., USA v. Calhoun, 516 U.S. 199, 205 (1996)—and a number here indeed are "complex and novel" (Pls.' Br. in Opposition to Motion to Certify at 14)—the Court does not believe any of the proposed questions satisfy the statutory criteria.

     First, Plaintiffs ask the Court to certify the issue of whether Vimeo had the "right and ability to control" the infringing activity on its system. See 17 U.S.C. 512(c)(1)(B). The Second Circuit in Viacom concluded that "the right and ability to control infringing activity under § 512(c)(1)(B) requires something more than the ability to remove or block access to materials posted on a service provider's website." 676 F.3d at 38 (internal quotation marks omitted). But the Circuit declined to provide further guidance regarding what constituted the "right and ability to control," beyond noting that inducing infringement and issuing detailed instructions regarding users' content "might" rise to the level of control. Id. In light of the limited guidance in Viacom and the statute's "confused" legislative history, see id. at 37, a "substantial ground for difference of opinion" exists regarding this issue, 28 U.S.C.§ 1292(b).

Nonetheless, this issue does not present a "controlling question of law." Id. Plaintiffs are unable to articulate the precise legal question that the September 18 Order raises with respect to this issue; their proposed question essentially asks whether, considering the totality of the circumstances in this case, Defendants had the right and ability to control users' content.[11] To be sure, the Court would welcome guidance from the Second Circuit on this issue, and appreciates that, should the Circuit certify the interlocutory appeal in the fashion that this Court does, a second appeal may be inevitable. Nonetheless, the issue Plaintiffs propose to certify is not a "pure question of law"; it could neither be resolved "quickly" nor "cleanly"; and it would require the Second Circuit "to study the record" closely. Narragansett Elec. Co. v. Am. Home Assur. Co., 921 F. Supp. 2d 166, 196 (S.D.N.Y. 2013).

Second, Plaintiffs seek certification of the Court's holding that Defendants must be willfully blind to specific instances of infringement to lose Safe Harbor protection. (See Order at 3.) This issue presents a "pure question of law" that would not require the Circuit to "study the record." Narragansett, 921 F. Supp. 2d at 196. But it is a question that the Circuit appears to have answered. In Viacom, the Court concluded that "the willful blindness doctrine" is another method of "demonstrat[ing] knowledge or awareness of specific instances of infringement under the DMCA." 676 F.3d at 35. In view of the Circuit's holding that "actual"

---

[11]     Plaintiffs propose two questions with respect to the right and ability to control. First: "Whether acts such as (1) the implementation and use of content monitoring programs designed to manipulate the visibility and availability of specific content and to enforce strict content 'guidelines'; (2) providing employee and staff feedback and approval as to uploaded content; (3) providing infringing content, instructing and encouraging users to provide infringing content; and (4) interacting with uploaded content, constitute the 'something more' noted by Viacom to give rise to the right and ability to control infringement." (Pls.' Opposition to Motion for Reconsideration and Certification at 16.) Second: "Whether conduct and statements that encourage others to infringe—such as posting infringing content, appearing in and assisting with the making and uploading of infringing content, encouraging and sanctioning the creating of infringing videos on a website's home page and public forums (including a type of video—'lip dubs'—that necessarily uses copyrighted music), promoting and 'liking' such content, providing technical assistance specifically instructing how to infringe music to those engaged in infringement, communicating both internally and directly to users that infringing works can be posted, hiring a team of employees to monitor and 'curate' content, and refusing to implement available filtering technologies—is 'inducement' for purposes of the right and ability to control, notwithstanding that the total scope of content on Vimeo may not have been overwhelmingly devoted to acts of 'wholesale infringement.'" (Id. at 16-17)

or "red flag" knowledge must relate to "specific and identifiable instances of infringement," id., it seems that proof of willful blindness must also be tied to specific instances of infringement. See also id. ("When [a service provider] has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning *of the particular infringing transactions* by looking the other way." (quotation marks omitted and emphasis added)).

Here, although Plaintiffs cited evidence that suggests that Vimeo employees may have turned a blind eye to infringement of musical recordings on the website, none of that evidence connects such "willful blindness" to any of the Videos-in-Suit. Because of this deficiency, the issue does not satisfy the second § 1292(b) criterion for certification.

For the same reason, the Court declines to certify the third issue Plaintiffs seek to appeal, relating to Defendants' knowledge of infringement. No evidence in the record showed that Defendants ever viewed the majority of the Videos-in-Suit; there is no "substantial ground for difference of opinion" on this issue. Nor were Plaintiffs entitled to summary judgment on the issue of knowledge with respect to the videos Vimeo employees uploaded or with which they otherwise interacted: although a jury could find that infringement in these videos was "objectively obvious," the evidence would not *require* such a finding.

Finally, the Court declines to certify Plaintiffs' three proposed questions relating to Vimeo's repeat infringer policy.[12] None of these three questions is a "pure question of law," and

---

[12] The three proposed questions are as follows. First: "Whether a purported repeat infringer policy that provides only that Vimeo 'reserves the right' to terminate users who use its service to infringe, without specifying the nature of the conduct or nature or type of violations that would result in termination, effectively communicates to users that there is a realistic threat of losing . . . access to the Vimeo system." (Pls.' Mem. in Opposition to Certification at 20 (internal quotation marks omitted).) Second: "Whether a repeat infringer policy has the ability to maintain the strong incentives for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers, when representatives and employees of the service provider are themselves engaged in acts of repeat infringement but are not terminated as users, observe others engaging in acts of repeat infringement, and encourage users to do so, without taking any action." (Id. at 21 (internal quotation marks and citation omitted).) Third: "Whether a service provider has reasonably implemented a repeat infringer policy where it fails to engage in any systematic tracking of user violations but instead relies on a demonstrably faulty and ad hoc system dependent upon the memory or subjective evaluation and discretion of the service provider's employees, and

all would similarly require the Second Circuit "to study the record." Narragansett, 921 F. Supp. 2d at 196.

## CONCLUSION

To summarize:

(1)     Defendants' motion for reconsideration of the Court's September 18 Order is GRANTED in part and DENIED in part. Defendants are entitled to summary judgment with respect to seventeen additional Videos-in-Suit: fifteen videos for which the only evidence of employee interaction was that the videos were uploaded by "Plus" users or users whose accounts had been "whitelisted," and two videos for which evidence of infringement was not "objectively obvious to a reasonable person."[13] Defendants' motion for reconsideration is denied with respect to the other Videos-in-Suit.

(2)     Plaintiffs' motion for leave to file an amended complaint to add additional works-at-issue is GRANTED.

(3)     Defendants' motion to certify for interlocutory appeal the September 18 Order is GRANTED. The Court certifies the following questions:

> (a)     Whether the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior to February 15, 1972; and
>
> (b)     Whether, under Viacom Int'l, Inc. v. YouTube, Inc., a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song may establish "facts or circumstances" giving rise to "red flag" knowledge of infringement.

---

where the service provider has produced only scattered documents which it purports to evidence the implementation of such a policy." (Id. (internal quotation marks omitted).)

[13]     See supra note 4 and accompanying text.

The Court's September 18, 2013 Order is amended to include this Opinion and Order. Defendants shall have ten days from the entry of this Opinion and Order to apply to the Second Circuit for leave to proceed with the appeal. The case is STAYED pending a determination by the Second Circuit.

The Clerk of Court is requested to terminate the motions pending at docket entries 121 and 126 in case number 09 Civ. 10101, and docket entries 117 and 122 in case number 09 Civ. 10105.

SO ORDERED.

Dated:     December 31, 2013
           New York, New York

Ronnie Abrams
United States District Judge

27